[No. S004723. Crim. No. 25643. Dec. 5, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
TROY ADAM ASHMUS, Defendant and Appellant.

COUNSEL

Linda F. Robertson, under appointment by the Supreme Court, and Charles Bush for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart and George Williamson, Chief Assistant Attorneys General, John H. Sugiyama, Assistant Attorney General, Dane R. Gillette, Herbert F. Wilkinson and Ronald S. Matthias, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

MOSK, J.—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment of death under the 1978 death penalty law (*id.*, § 190 et seq.).

On August 17, 1984, the District Attorney of Sacramento County filed an information against defendant Troy Adam Ashmus in the superior court of that county.

Count I charged that on May 19, 1984, defendant murdered Marcella D. in violation of Penal Code section 187. It was alleged that he committed the

offense under the following special circumstances: (1) felony murder in the course of rape under Penal Code section 261, within the meaning of Penal Code section 190.2, subdivision (a)(17)(iii); (2) felony murder in the course of sodomy under Penal Code section 286, within the meaning of Penal Code section 190.2, subdivision (a)(17)(iv); and (3) felony murder in the course of a lewd or lascivious act on the person of a child under 14 years of age under Penal Code section 288, within the meaning of Penal Code section 190.2, subdivision (a)(17)(v). Counts II, III, and IV charged, respectively, that on that same date defendant engaged in rape, sodomy, and lewd or lascivious conduct against the same victim, in violation of the statutory provisions cited above—specifically, as to rape, former subdivision (2) (current subd. (a)(2)) of Penal Code section 261 (Stats. 1983, ch. 949, § 1, p. 3416); as to sodomy, subdivision (c) of Penal Code section 286; and as to lewd or lascivious conduct, subdivision (b) of Penal Code section 288.

Defendant pleaded not guilty to the charges and denied the special circumstance allegations. On his motion, the court subsequently changed venue from Sacramento to San Mateo County.

Trial was by jury. The jury returned verdicts finding defendant guilty as charged, determined the murder to be of the first degree, and found all the special circumstance allegations true. It subsequently returned a verdict of death. The court entered judgment accordingly, sentencing defendant to death for the murder and to full, separate, and consecutive middle terms of six years in prison for each of the three noncapital offenses.

As we shall explain, we conclude that the judgment must be affirmed.

## I. FACTS

### A. *Guilt Phase*

Most of the basic facts relevant here were essentially undisputed at trial.

About 4 o'clock on the afternoon of Saturday, May 19, 1984, Marcella (Marcie) D., who was seven years of age, rode to Howe Park in Sacramento on her bicycle. There she met her brother Arby, age 10, who was responsible for her, and Arby's friend Ernesto (P.J.) G., age 9. Arby and P.J. walked to a pond to fish from a dock, and Marcie went to play with some children within a few feet of the boys.

Defendant, who was 22 years old, approached Arby and P.J. as they were fishing. For the past few days he had been camping in an area in adjacent Santa Anita Park called Stoner's Pit, a site that was filled with litter but also

secluded and covered with vegetation. He gave the boys advice and help in their fishing, and stayed nearby.

About 5 or 5:30 p.m., Arby and P.J. walked to the park clubhouse. Marcie soon rode up. She said that she was going off to Santa Anita Park with defendant: he had told her that he knew of a duck's nest there, and that he would give her a duckling if any had hatched. The boys said that she should return in about an hour.

Defendant and Marcie proceeded to Stoner's Pit. Once there, he subjected her to a fatal attack. He raped her and perhaps also penetrated her with some foreign object, making a very large tear through the length of her vagina to within a quarter of an inch of her rectum. He sodomized her, inflicting two small wounds in the anal or rectal tissue. He possibly committed oral copulation by inserting his penis into her mouth. He evidently ejaculated over her body. He stuffed into her mouth and throat material including two plastic bags, a piece of cellophane about six inches long and two to three inches wide, and a pair of red shorts she had been wearing; the bags were wedged side-by-side in separate tight wads deep in her throat with the cellophane in between; the shorts were tightly compressed within her mouth; the bags obstructed her throat and caused her to die by asphyxiation. Covering her naked body with a carpet remnant he had used for a sleeping mat during his stay at Stoner's Pit, he fled the scene.

When Marcie did not return as she had been told, Arby and P.J. became concerned. They searched without success. Arby telephoned his father. He too searched without success. The police were called in. About 8:30 p.m., a neighborhood man who was assisting the officers found Marcie's body. Within a few hours, defendant was arrested. He had fresh abrasions on at least one of his hands. It does not appear that the duck's nest of which defendant spoke had ever existed.

Although most of the basic facts were essentially undisputed, one was strongly contested: intent to kill. The People sought to prove intent by evidence including the manner and means defendant used to kill Marcie. By contrast, defendant, who took the stand himself, expressly denied intent. In his testimony, he generally confessed his culpability, admitting that he had lied in extrajudicial statements to the police and others in which he attempted to avoid responsibility and even tried to shift blame to his brother Tracy, who was three years younger. All the same, he asserted that Marcie's death was accidental.

Beyond the basic facts set out above, the People and defendant disputed the proper characterization of the events.

The People attempted to prove that defendant was especially cruel and his attack singularly brutal. They relied largely on the established circumstances of the offenses.

For his part, defendant tried to show the opposite. For example, he testified to the following effect: he had consumed marijuana on the day in question; not long after reaching Stoner's Pit with Marcie, "something right then and there hit me"; he asked her to take her clothes off, and she complied; he then took off his own; his intention was "[j]ust to make her happy"; at first, she did not resist "because all I was doing was I was like a man would regularly treat a woman"; during what he called "the process of making love to her," he did "nothing that would be harmful"; "Let's put it this way," he continued, "when I make love to a woman—one of my girlfriends—she don't have no complaints at all"; soon, however, Marcie's eyes began to flow with tears and she cried for help; "[a]bout two seconds later someone walked by and yelled out, 'Did someone holler for help?' "; he then pushed the plastic bags into her mouth, but only "to keep her quiet"; after the act, he cleaned himself off and dressed; "I believe she was still moving when I finally left"; he did not remove the bags from her mouth because "I forgot they were there"; he covered her with the carpet remnant "out of courtesy"; he felt remorse and shame, apparently from the very moment he did the deed; and he stated that he preferred to refer to Marcie as a "person" because "I'm tired of people using the word 'child.' "

### B. *Penalty Phase*

In their case in aggravation, the People introduced evidence to prove that defendant suffered two felony convictions: the first, in 1981, for burglary in the second degree in violation of Penal Code sections 459 and 460, in Kern County; and the second, in 1985, for assault with intent to commit rape in violation of Penal Code section 220, in Sacramento County. They also presented evidence to establish the facts underlying the latter conviction. Lisa Cronin, the victim, testified that in the early hours of May 19, 1984—the date of the crimes against Marcie—defendant attacked her, and in fact bruised and sprained one of her arms; he announced his intent to commit rape; but he fled without accomplishing his purpose when bystanders came to her aid.

In his case in mitigation, defendant introduced evidence to generally describe his background and character, from before birth up until the time of trial. The testimony, given by lay witnesses as well as psychiatric and psychological experts, painted the following picture: defendant suffered abuse and neglect from his earliest years at the hands of his father and mother; his parents had a troubled and unhappy marriage, which was dis-

solved when he was about 17 or 18 years old; he was an emotionally and behaviorally disturbed child, youth, and adult; over the years, he had been cruel to animals and hurtful to his peers; he had experimented with drugs; he was friendless, angry, and refractory; and he may have experienced organic brain damage or impairment. Further, the evidence supported an inference that he may have been under the influence of some mental or emotional disturbance at the time of the crimes. It also showed that his burglary conviction arose from petty, nonviolent criminal conduct. In addition, it suggested that he would not be dangerous in prison if his life were spared.

In rebuttal, the People introduced evidence through the testimony of a psychologist, who opined that defendant had not, in fact, experienced organic brain damage or impairment.

## II. JURY-SELECTION ISSUES

Defendant raises a number of claims bearing on the process of jury selection in order to demonstrate that the judgment should be reversed as to guilt or at least as to penalty. As will be shown, none is meritorious.

### A. *Introduction*

 At defendant's request, the trial court employed a modified version of the "struck jury" system to select the jurors who would try the case, instead of the "jury box" system defined by statute (see generally former Pen. Code, § 1055 et seq.; current Code Civ. Proc., § 225 et seq.).[1]

The prospective jurors were first examined for hardship, and some were excused on that basis. Those who remained were questioned individually and in sequestration (following limited group preinstruction and voir dire), and some were excluded for cause. Those who remained after that stage had their names drawn randomly and listed in the order drawn; each side was allotted 26 peremptory challenges against prospective jurors and 5 against prospective alternates; prospective jurors "1" through "12" were drawn into the jury box; the People and defendant alternately struck (or passed) the prospective

---

[1] In *People* v. *Wright* (1990) 52 Cal.3d 367 [276 Cal.Rptr. 731, 802 P.2d 221], we explained the difference between the jury-box and struck-jury methods. " 'In the "jury box" system . . . , the parties exercise their challenges against jurors already seated in the box, and who will remain on the jury unless challenged.' [Citation.] This is the system utilized in California. However, 'the "struck jury" method . . . [is] where the trial judge tenders to each party a list of qualified veniremen and each side exercises its peremptories against the names on the list. If, after each side exercises its strikes, there remains more than 12 persons on the list, the trial judge must decide which twelve will constitute the jury.' " (*Id.* at p. 396.)

jurors in the box, with prospective juror "13" taking the place of the first person struck, prospective juror "14" taking the place of the second, and so on; in all, the People struck 22 prospective jurors and 4 prospective alternates, and defendant struck 19 of the former and 3 of the latter; neither side expressed any dissatisfaction with any of the persons selected as jurors or alternates; finally, 12 jurors and 5 alternates were sworn.

### B. *Denial of Motion as to "Guilt Phase Includables"*

■■ ■■ ■ Prior to the commencement of jury selection, defendant moved the trial court for an order to govern the process of "California death qualification," to the following effect: (1) not to exclude "guilt phase includables" at that phase for cause for actual bias; and (2) to prohibit the People from attempting to exclude such persons on that basis.[2] He claimed that such exclusion violates, among other provisions, the Sixth Amendment to the United States Constitution and article I, section 16, of the California Constitution—including, as relevant here, the guaranties of trial by an impartial jury and trial by a jury drawn from a fair cross-section of the community.

The trial court denied the motion. It rested its decision, in pertinent part, on a conclusion that the law did not support the position that defendant had taken.

■ Defendant contends that the trial court's ruling was erroneous. We disagree.

The exclusion through "California death qualification" of "guilt phase includables" does not offend the Sixth Amendment or article I, section 16, as to the guaranty of trial by a jury drawn from a fair cross-section of the community. (E.g., *People* v. *Fields* (1983) 35 Cal.3d 329, 342-353 [197 Cal.Rptr. 803, 673 P.2d 680] (plur. opn.); *id.* at pp. 374-375 (conc. opn. of Kaus, J.); *People* v. *Guzman* (1988) 45 Cal.3d 915, 948-949 [248 Cal.Rptr. 467, 755 P.2d 917]; see, e.g., *People* v. *Warren* (1988) 45 Cal.3d 471, 479 [247 Cal.Rptr. 172, 754 P.2d] [adhering to *Fields*]; see also *Lockhart* v. *McCree* (1986) 476 U.S. 162, 173-177 [90 L.Ed.2d 137, 147-150, 106 S.Ct. 1758] [dealing solely with the federal constitutional right].)

---

[2]"California death qualification" limits "[t]he pool of jurors eligible to serve in a capital trial in California" to "those persons eligible to serve in a noncapital case whose attitudes toward capital punishment would place them in either the 'favor death penalty,' 'indifferent,' or 'oppose death penalty' group." (*Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 63 [168 Cal.Rptr. 128].) "[G]uilt phase includables" (*id.* at p. 17, fn. 36) are those persons who would "automatically vote against death at the penalty phase" but could be "fair and impartial" at the guilt phase (*id.* at p. 17, italics deleted).

Neither does such exclusion offend the Sixth Amendment or article I, section 16, as to the guaranty of trial by an impartial jury. (E.g., *People* v. *Melton* (1988) 44 Cal.3d 713, 732 [244 Cal.Rptr. 867, 750 P.2d 741] [impliedly dealing with both federal and state constitutional rights]; *People* v. *Hamilton* (1988) 46 Cal.3d 123, 136 [249 Cal.Rptr. 320, 756 P.2d 1348] [same]; see also *Lockhart* v. *McCree, supra,* 476 U.S. at pp. 177-184 [dealing solely with the federal constitutional right].)

Defendant asks us to revisit these questions. We decline to do so. To the extent that he urges departure from precedent laid down by the United States Supreme Court or by this court, his request is refused: we must follow the former and will follow the latter.[3]

### C. *Limitation of Examination on Voir Dire*

 Defendant contends that the trial court erred when it limited his examination of prospective jurors on individual sequestered voir dire, assertedly in violation of California law as construed in *People* v. *Williams* (1981) 29 Cal.3d 392 [174 Cal.Rptr. 317, 628 P.2d 869].

From the very beginning of individual sequestered voir dire, as they extensively questioned the prospective jurors on their understanding of the two possible sentences at the penalty phase, defense counsel declared that life imprisonment without possibility of parole meant life imprisonment *without possibility of parole.* In so doing, they stated or implied that the penalty would inexorably be carried out. They contrasted life imprisonment without possibility of parole, which might be imposed on defendant, with life imprisonment *simpliciter,* which had been imposed on such notorious criminals as Charles Manson and Sirhan Sirhan.

After 16 prospective jurors had been examined, the prosecutor objected to defense counsel's examination on the ground that the questioning "unduly emphasize[d]" life imprisonment without possibility of parole and was "in the form of argument and comment on the law." He said, "One or two questions on the subject I think would be sufficient."

The trial court expressed a concern to avoid the topic of possible postverdict governmental actions bearing on execution of penalty, specifically, commutation by the Governor of the sentence of death.

---

[3]In attacking the trial court's ruling, defendant claims perfunctorily that the exclusion through "California death qualification" of "guilt phase includables" violates the due process clauses of the Fourteenth Amendment to the United States Constitution and article I, sections 7 and 15, of the California Constitution. This point is at best a restatement of those addressed and rejected above.

Defense counsel responded that the prospective jurors did not understand life imprisonment without possibility of parole, and needed instruction thereon.

The trial court stated that both the prosecutor and defense counsel were "entitled to ask" the prospective jurors "how they feel about the two subject matters. Namely, death or life without the possibility of parole." But it also said: "We are not here to instruct them on the law at this point. What we are here to talk about is their qualifications." Later, it reiterated: "This is not the time to preinstruct the jury or precondition them."

The trial court proceeded to rule as follows: "I will allow the question, 'Do you understand that life without possibility of parole really means that in California; no eligibility for parole?' If they say yes to that, that's it. If they want to know more, you can ask them. I don't want any references to Manson or Sirhan or that stuff. It has nothing to do with their qualifications to sit on this case." (Paragraphing omitted.)

Thereafter, eight more prospective jurors were examined. Defense counsel continued to declare that life imprisonment without possibility of parole meant life imprisonment *without possibility of parole.* And they continued to state or imply that the penalty would inexorably be carried out.

When the last of these eight prospective jurors, Kenneth N. Judnick, was passed for cause by both sides, defense counsel stated that defendant had wished to examine Judnick more extensively as to life imprisonment without possibility of parole because of what he believed to be Judnick's possible lack of understanding. Counsel added that in his view, the meaning of the penalty was generally a "very crucial point" and called for more extensive questioning. The trial court responded that Judnick "understood" the matter "very clearly."[4]

Following this interchange, the trial court undertook to instruct each of the remaining 103 prospective jurors—and actually instructed almost all of them—that life imprisonment without possibility of parole meant life imprisonment *without possibility of parole.* In doing so, it sometimes suggested that the penalty would inexorably be carried out. Defense counsel continued as previously in this regard. Even the prosecutor occasionally made comments to similar effect.

In *People* v. *Williams, supra,* 29 Cal.3d 392, we construed relevant statutory provisions, including former Penal Code section 1078, and reconsidered

---

[4]We note in passing that prospective juror Judnick was subsequently excused on the People's peremptory challenge.

pertinent cases, among them *People* v. *Edwards* (1912) 163 Cal. 752 [127 P. 58]. (29 Cal.3d at pp. 398-407.) ■ We "le[ft] intact the considerable discretion of the trial court to contain voir dire within reasonable limits." (*Id.* at p. 408.) But we held that "counsel should be allowed to ask questions reasonably designed to assist in the intelligent exercise of peremptory challenges whether or not such questions are also likely to uncover grounds sufficient to sustain a challenge for cause." (*Id.* at p. 407.) We proceeded to "reaffirm that it is not 'a function of the examination of prospective jurors to educate the jury panel to the particular facts of the case, to compel the jurors to commit themselves to vote a particular way, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, or to instruct the jury in matters of law.' [Citation.] Therefore, a question may be excluded if it appears to be intended solely to accomplish such improper purpose." (*Id.* at p. 408, fn. omitted.)

■ On appeal, as *Williams* itself makes plain (see 29 Cal.3d at pp. 409-412), a ruling by a trial court limiting examination of prospective jurors on voir dire is subject to review under the abuse-of-discretion standard.

■ Applying that test here, we find no error. As noted, the trial court ruled as follows: "I will allow the question, 'Do you understand that life without possibility of parole really means that in California; no eligibility for parole?' If they say yes to that, that's it. If they want to know more, you can ask them." (Paragraphing omitted.) In making its determination, the court evidently recognized, and sought to follow, such relevant decisions as *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810], and *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430]. In *Morse* we held to the effect that in deciding on penalty in a capital case, the jury is to consider only the criminal and his crime—and not possible postverdict governmental actions bearing on execution of sentence. (60 Cal.2d at pp. 636-653.) In *Ramos* we concluded that an instruction that the Governor could commute both a sentence of death and life imprisonment without possibility of parole would "violate the state constitutional due process guarantee because its reference to the commutation power invites the jury to consider matters that are both totally speculative and that should not, in any event, influence the jury's determination." (37 Cal.3d at p. 155.)

In pertinent part, defense counsel's examination of the prospective jurors was apparently not designed—and was certainly not conducted—to assist in the intelligent exercise of challenges. Indeed, as counsel themselves effectively admitted, their questioning was intended to "instruct" the prospective jurors that life imprisonment without possibility of parole meant life impris-

onment *without possibility of parole*—and also, it seems, to suggest to them that the penalty would inexorably be carried out.

The trial court might properly have prohibited such examination altogether. Instead, it merely imposed a limitation. Its evident purpose was to prevent undue emphasis by defense counsel on life imprisonment without possibility of parole. It did so in order not to trigger speculation by the prospective jurors as to possible postverdict governmental actions bearing on execution of penalty. In proceeding as it did, the court acted reasonably.

Defendant argues against our conclusion. His point appears to be as follows: he was entitled to assure himself that the prospective jurors fully understood, and actually believed, that life imprisonment without possibility of parole meant life imprisonment *without possibility of parole*; but the trial court's ruling frustrated his attempts to do so. We doubt the entitlement. The assurance defendant apparently sought seems unattainable. We also doubt the effect. The ruling did indeed limit examination in this area, but not unduly so. Indeed, it appears to have drawn a reasonable line between productive and counterproductive questioning. To the extent that defendant's argument assumes that a party has a right to "instruct" the prospective jurors on the meaning of life imprisonment without possibility of parole, it is unsupported. In *Williams* we declared all but expressly that no such right exists. (29 Cal.3d at p. 408.)

It is manifest that the trial court's ruling could not have had any appreciable effect on the process or outcome of the jury's deliberations.

On its face, as we have concluded, the ruling did not unduly limit defendant's examination of prospective jurors on voir dire. Neither did it impose any such limitation as applied. Defendant asserts that defense counsel's questioning was "obviously chilled." The record is otherwise.

More important, the trial court and/or defense counsel and/or the prosecutor generally "instructed" the prospective jurors—including, specifically, all who were subsequently sworn to serve as jurors or alternates—that life imprisonment without possibility of parole meant life imprisonment *without possibility of parole*. In so doing, they sometimes suggested—favorably to defendant, but inaccurately—that the penalty would inexorably be carried out.[5] Defendant challenges the effectiveness of the "instruction." His attack

---

[5] In *People* v. *Thompson* (1988) 45 Cal.3d 86 [246 Cal.Rptr. 245, 753 P.2d 37], we observed that "It is . . . incorrect to tell the jury the penalty of death or life without possibility of parole will inexorably be carried out . . . ." (*Id.* at p. 130.) On that basis we concluded that

relies ultimately on speculation. Speculation, however, is insufficient. To be sure, as a group the prospective jurors did not enter or leave voir dire with a *technical* knowledge of life imprisonment without possibility of parole. But the record shows that they obtained an understanding adequate for their purposes.

We recognize that in the absence of the trial court's ruling, defendant would probably have examined the prospective jurors more extensively and, as a result, might possibly have discovered further useful information. But on this record, such probabilities and possibilities are without consequence.[6]

### D. *Excusal of Prospective Jurors Because of Their Views Opposing Capital Punishment*

 Defendant contends in substance that the trial court erred under the Sixth Amendment to the United States Constitution and article I, section 16, of the California Constitution, with their impartial-jury guaranties, when it excused prospective jurors Michael J. Sullivan, Jr., Christine Giffin, and Johnnie D. Van Giesen for actual bias because of their views opposing capital punishment.

In *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], the United States Supreme Court implied that a prospective juror could not be excused for cause without violating a defendant's federal constitutional right to an impartial jury unless he made it "unmistakably clear" that he would *"automatically"* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before" him, or that his "attitude toward the death penalty would prevent [him] from making an impartial decision as to the defendant's *guilt.*" (*Id.* at pp. 522-523, fn. 21 [20 L.Ed.2d at p. 785], italics in original.)

In *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], however, the court "clarif[ied]" *Witherspoon* and declared that the

---

it would be error for a trial court to instruct to that effect at the penalty phase. (*Id.* at pp. 130-131.) Our premise was that a court may not give an instruction that is incorrect. (See *ibid.*) We went on to state in dictum: "In general, impressing the jury with the weight of its responsibility is beneficial. Hence it [is] not necessarily error [for the court]"—or impropriety for counsel—"to suggest to them on voir dire that the sentence they decide on will be carried out." (*Id.* at p. 131.) To be sure, the end is good. Whether the means are as well is open to question. Be that as it may, the dictum does not figure in our analysis. Therefore, it need not be scrutinized further.

[6]Defendant claims that the trial court's ruling violated the due process clauses of the Fourteenth Amendment to the United States Constitution and article I, sections 7 and 15, of the California Constitution; the Sixth Amendment and article I, section 16, with their impartial-jury guaranties; and the cruel and unusual punishments clauses of the Eighth Amendment and article I, section 17. In our view, the ruling did not implicate any of the cited constitutional provisions. Indeed, as explained above, it could not have had any appreciable effect on the process or outcome of the jury's deliberations.

proper standard for excusal was "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" (*Id.* at p. 424 [83 L.Ed.2d at pp. 851-852], quoting *Adams* v. *Texas* (1980) 448 U.S. 38, 45 [65 L.Ed.2d 581, 589, 100 S.Ct. 2521].)

In *People* v. *Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250], we adopted the *Witt* standard as the test for determining whether a defendant's state constitutional right to an impartial jury was violated by an excusal for cause.

Thereafter, in *People* v. *Coleman* (1988) 46 Cal.3d 749, 765 [251 Cal.Rptr. 83, 759 P.2d 1260], we construed *Witt* in accordance with its plain terms, and beyond the factual context of *Witherspoon*, to state a measure of "partiality" that may be applied against prospective jurors in favor of capital punishment as well as those in opposition.

■ On appeal, the trial court's determination as to whether and how the prospective juror's views on capital punishment would affect his performance as a juror is entitled to deferential review. (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1262 [270 Cal.Rptr. 451, 792 P.2d 251].) The general standard is substantial evidence. (*People* v. *Cooper* (1991) 53 Cal.3d 771, 809 [281 Cal.Rptr. 90, 809 P.2d 865].) The court's threshold finding on what those views actually are is examined under that same test. Such a finding, we have stated, is generally "binding" "if the prospective juror's responses are equivocal . . . or conflicting . . . ." (*Ibid.*; see *People* v. *Daniels* (1991) 52 Cal.3d 815, 875 [277 Cal.Rptr. 122, 802 P.2d 906] [to similar effect]; see also *People* v. *Fredericks* (1895) 106 Cal. 554, 559 [39 P. 944] [a finding of this sort, however, will be struck down "when the evidence upon the examination of the juror is so opposed to the decision of the trial court that the question becomes one of law"].)

The exclusion of a prospective juror in violation of *Witherspoon* and *Witt* requires automatic reversal—but only as to penalty and not as to guilt. (*Gray* v. *Mississippi* (1987) 481 U.S. 648, 666-667 [95 L.Ed.2d 622, 638-639, 107 S.Ct. 2045] (opn. of the court); *id.* at pp. 667-668 [95 L.Ed.2d at pp. 638-639] (plur. opn.); *id.* at p. 672 [95 L.Ed.2d at p. 642] (conc. opn. of Powell, J.); see *Witherspoon* v. *Illinois, supra,* 391 U.S. at pp. 521-523 [20 L.Ed.2d at pp. 784-786] [antedating *Witt*].)

■ At individual sequestered voir dire, the People challenged prospective jurors Sullivan, Giffin, and Van Giesen because of their views opposing capital punishment. Defendant presented opposition. The trial court sustained the challenges and excused Sullivan, Giffin, and Van Giesen.

After review, we find no error.

Prospective juror Sullivan's views on capital punishment would, at the very least, have substantially impaired the performance of his duties as a juror. To be sure, as the trial court determined, he apparently could consider the death penalty as a reasonable possibility. But on more than one occasion during voir dire, he made plain that his feelings about the ultimate sanction would lead him to apply to the question of guilt or innocence a standard of proof higher than proof beyond a reasonable doubt.

Next, prospective juror Giffin's views on capital punishment would likely have prevented—and would certainly have substantially impaired—the performance of her duties as a juror. Through the beginning and middle of voir dire, she was reluctant to state her opposition to the death penalty categorically. But near the end, she declared without qualification: "My decision is not going to be the death penalty." She proceeded to affirm that "under no circumstances" would she impose the ultimate sanction.

Lastly, prospective juror Van Giesen's views on capital punishment would almost surely have prevented—and would surely have substantially impaired—the performance of her duties as a juror. Throughout voir dire, she revealed that she would all but automatically reject the death penalty and choose life imprisonment without possibility of parole. Like Giffin, she was reluctant to state her opposition categorically. But she asserted unreservedly: "The way I feel now and the way I was raised and what I have always believed that nobody has the right to take a life. The judge says the state does, but if I'm on this jury, you make me the state. You make me responsible for taking someone else's life. I can't be responsible for taking another life." (Paragraphing omitted.)

Defendant argues against our conclusion, but he is not persuasive. He asserts that if a prospective juror "aver[s]" that he will apply the standard of proof beyond a reasonable doubt "yet . . . frankly concede[s] that the prospects of the death penalty may affect . . . what [he] may deem to be a reasonable doubt" (*Adams* v. *Texas, supra*, 448 U.S. at p. 50 [65 L.Ed.2d at p. 593]), he could adequately perform his duties as a juror. Defendant claims that prospective juror Sullivan made such an averment. The record is otherwise. He also asserts that if a prospective juror could simply consider imposing the death penalty, he could adequately perform his duties as a juror. He claims that prospective jurors Giffin and Van Giesen could give such consideration. ■ But a juror must be able to do more, specifically, to consider imposing the death penalty *as a reasonable possibility*. Giffin and Van Giesen revealed an inability to do so.

 Throughout his argument, defendant maintains that the record does not support our result. We do not agree that voir dire was insufficient. We do agree, however, that prospective jurors Sullivan, Giffin, and Van Giesen each made certain statements that might be characterized as equivocal or ambiguous. Such statements, however, were relatively few, isolated, and unemphatic. Certainly, the trial court considered them insignificant. It effectively concluded that each of the three held views that would prevent or substantially impair the performance of his or her duties as a juror. We find no reason to disagree.[7]

### E. Refusal to Excuse Prospective Jurors Because of Their Views Favoring Capital Punishment

 Defendant contends in substance that the trial court erred under the Sixth Amendment to the United States Constitution and article I, section 16, of the California Constitution, with their impartial-jury guaranties, when it refused to excuse prospective jurors Silvio P. Trapani, Betty V. Chadwick, Russell C. Wong, and William H. Wisecarver, Jr., for actual bias because of their views favoring capital punishment.

At individual sequestered voir dire, defendant challenged prospective jurors Trapani, Chadwick, Wong, and Wisecarver, as relevant here, because of their views favoring capital punishment. The People presented opposition. The trial court overruled the challenges.

It turned out that prospective jurors Trapani, Chadwick, Wong, and Wisecarver were not among those chosen to serve as jurors or alternates. Chadwick and Wisecarver were not drawn into the jury box as potential jurors or alternates. Trapani and Wong were drawn as potential jurors, but were removed by defendant's peremptory challenge. When the selection of the jurors was completed, defendant had seven peremptory challenges remaining out of twenty-six; when the selection of the alternates was completed, he had two remaining out of five.

Defendant now claims that the trial court erred by overruling his "for cause" challenges against prospective jurors Trapani, Chadwick, Wong, and Wisecarver. For purposes here, we shall assume—against the People's argument—that the point is preserved for review and is in fact meritorious.[8] But as will be shown, reversal is not required.

---

[7]Defendant claims that the trial court's allegedly erroneous excusal of prospective jurors Sullivan, Giffin, and Van Giesen violated the cruel and unusual punishments clauses of the Eighth Amendment to the United States Constitution and article I, section 17, of the California Constitution. But no error, no violation.

[8]To preserve a claim of error relating generally to the composition of the jury and specifically to the denial of a challenge for cause, the defendant must usually exhaust his

"It appears that with the exception of an improper '*Witherspoon* exclusion' "—which, of course, is not presented here—"an erroneous ruling on a 'for cause' challenge is not automatically reversible but is subject to scrutiny for prejudice under harmless-error analysis." (*People* v. *Gordon*, *supra*, 50 Cal.3d at p. 1247.) This principle applies generally: it matters not whether the error merely offends state law or amounts to a violation of the United States Constitution. (See *ibid.*) Prejudice turns on whether the defendant's right to a fair and impartial jury was affected. That is certainly true when state law is implicated. (*People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1087 [259 Cal.Rptr. 630, 774 P.2d 659].) It is also true, we believe, when a federal constitutional violation is involved.

State-law error of this sort, bearing as it does on penalty in a capital case, is reviewed under the "reasonable possibility" standard of *People* v. *Brown* (1988) 46 Cal.3d 432, 446-448 [250 Cal.Rptr. 604, 758 P.2d 1135]. Error of federal constitutional dimension, by contrast, is scrutinized under the "reasonable doubt" standard of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824]. (*People* v. *Coleman, supra*, 46 Cal.3d at p. 768.) The two tests are the same in substance and effect. (*People* v. *Brown, supra*, at p. 467 (conc. opn. of Mosk, J.) [citing *Chapman* v. *California, supra*, at p. 24 (17 L.Ed.2d at pp. 710-711), which treats as equivalent the federal constitutional "reasonable possibility" and "reasonable doubt" standards].)

---

peremptory challenges. (E.g., *People* v. *Coleman, supra*, 46 Cal.3d at p. 770.) This has " '. . . long been the rule in California . . . .' " (*Ibid.*, quoting *Kimbley* v. *Kaiser Foundation Hospitals* (1985) 164 Cal.App.3d 1166, 1169 [211 Cal.Rptr. 148].) The rationale is in substance that the defendant may not complain of error when he himself had the opportunity and the ability to prevent any ensuing harm. (See, e.g., *People* v. *Goldberg* (1952) 110 Cal.App.2d 17, 23 [242 P.2d 116].) The rule applies when the struck-jury system is employed as well as when the jury-box method is used. (*People* v. *Morris* (1991) 53 Cal.3d 152, 184-186 [279 Cal.Rptr. 720, 807 P.2d 949].)

It seems that the claim here is not preserved: as noted, defendant did not exhaust his peremptory challenges.

Defendant argues that the rule of exhaustion may properly be applied to the jury-box system but not to the struck-jury system. He is not persuasive. The rationale of the rule appears applicable to both. It is true, as defendant states, that in the jury-box system the parties exercise their peremptory challenges in ignorance of the state of mind of the prospective jurors who may be drawn into the jury box, whereas in the struck-jury system they do so with knowledge thereof. That difference, however, seems immaterial for purposes here. We recognize that a struck-jury defendant may have a reason to save a peremptory, viz., to defend against the selection of a prospective juror whom he presently considers objectionable. But a jury-box defendant may have a similar reason to save a peremptory, viz., to defend against the selection of a prospective juror whom he might later discover to be objectionable. We have never deemed the reason of the jury-box defendant to be sufficient to excuse compliance with the rule of exhaustion. We do not view the reason of the struck-jury defendant to be more powerful.

After review, we can discern no prejudice flowing from the "erroneous" overruling of defendant's "for cause" challenges against prospective jurors Trapani, Chadwick, Wong, and Wisecarver. It is evident that defendant's right to a fair and impartial jury was not affected thereby. None of the foregoing persons served as a juror or even as an alternate. On this record, none could have tainted the panel's members with his or her alleged bias. Accordingly, none could have influenced the process or result of the deliberations. That an allegedly biased juror might have sat had he or she not been removed by peremptory challenge does not implicate the right to a fair and impartial jury in any substantial way.

Defendant disagrees with our conclusion that reversal is not required. He argues against the applicability of harmless-error analysis. In *People* v. *Gordon, supra,* 50 Cal.3d at page 1247, we rejected such a point. He relies on language in *Gray* v. *Mississippi, supra,* 481 U.S. at page 665 [95 L.Ed.2d at page 637], that "the relevant inquiry is 'whether the composition of the *jury panel as a whole* could possibly have been affected by the trial court's error.'" (Italics in original.) But as we explained in *Gordon,* "that language was all but disapproved in *Ross* v. *Oklahoma* (1988) 487 U.S. 81 . . . ." (50 Cal.3d at p. 1247.) "It is the merest speculation whether an erroneous ruling on a 'for cause' challenge might actually have had any significant effect and, if so, whether such effect might have helped or harmed the defendant. Hence, the inquiry identified by the *Gray* court cannot serve as a principled basis on which to conclude that the error should be deemed automatically reversible as a general matter, or even that it caused any harm in an individual case." (*Ibid.*)

Defendant then argues against the application of harmless-error analysis here. But any "harm" he may have suffered is conjectural at best. He effectively conceded the point below: as noted, he did not express any dissatisfaction with any of the persons selected as jurors or alternates.

Contrary to defendant's assertion, the fact that the trial court—at his own request—employed a modified version of the struck-jury system is of no consequence for the applicability of harmless-error analysis or even the actual application of such analysis in this case. Under the method of jury selection employed here, each side was able to exercise its peremptory challenges with knowledge of the state of mind of the prospective jurors who might be drawn into the jury box and also with knowledge of the order in which they would be drawn—knowledge that it would not have had if the jury-box method had been used. Accordingly, each side could "calculate," in some rough way, the relative cost and benefit of any given peremptory: the possible benefit was, of course, the present removal of a prospective juror

whom the party considered objectionable; the possible cost was the inability to remove at a later time a prospective juror whom the party considered more objectionable still. We do not believe—and certainly defendant does not show—that the method of jury selection employed here calls for a rule or result different from that stated above.[9]

F. *Excusal of Prospective Jurors on the People's Peremptory Challenge Assertedly in Violation of the United States and California Constitutions*

During voir dire, as noted above, the People removed 22 prospective jurors and 4 prospective alternates by peremptory challenge. Now for the first time, defendant asserts that the prosecutor used his peremptories to systematically exclude all prospective jurors and prospective alternates—totaling 10 in number—who expressed reservations about capital punishment but were apparently not excludable for cause on the basis of actual bias.

Defendant effectively contends that by acting as he did, the prosecutor violated the following provisions of the United States and California Constitutions—specifically, the due process clauses of the Fourteenth Amendment and article I, sections 7 and 15; the Sixth Amendment and article I, section 16, with their guaranties of trial by an impartial jury and trial by a jury drawn from a fair cross-section of the community; and the cruel and unusual punishments clauses of the Eighth Amendment and article I, section 17.

But " '[W]e see no . . . constitutional infirmity in permitting peremptory challenges by both sides on the basis of specific juror attitudes on the death penalty. While a statute requiring exclusion of all jurors with any feeling against the death penalty produces a jury biased in favor of death [citation], we have no proof that a similar bias arises, on either guilt or penalty issues, when *both parties* are allowed to exercise their equal, limited numbers of peremptory challenges . . . against jurors harboring specific attitudes they reasonably believe unfavorable. [Citation.] [¶] We recognize that a jury shorn of significant community viewpoints on an issue in the case is not ideally suited to the "purpose and functioning of a jury in a criminal trial." [Citation.] That, however, is a result inherent in the parties' historic and important right to exclude a limited number of jurors for fear of bias.' " (Italics in original.) (*People* v. *Gordon, supra,* 50 Cal.3d at p. 1263, quoting *People* v. *Turner* (1984) 37 Cal.3d 302, 315 [208 Cal.Rptr. 196, 690 P.2d

---

[9]In addition to the foregoing, defendant raises a number of related claims. As a general matter, each is substantially reducible to, or dependent on, the point addressed and rejected above. None establishes reversibility.

669] (plur. opn.), overruled on another point in *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1149 [240 Cal.Rptr. 585, 742 P.2d 1306].)

### III. GUILT ISSUES

Defendant raises a number of claims for reversal of the judgment as to guilt. As will appear, none succeeds.

A. *Denial of Motion to Suppress Defendant's Extrajudicial Statement*

Prior to trial, defendant moved to suppress evidence of a statement he made to the police during custodial interrogation after his arrest. At the beginning of the interview, he was advised of, and waived, his rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602], including his right to remain silent. The People proposed to introduce at trial the opening part of the statement, which contained admissions serving to link defendant to the scene of the crime. The final portion of that part is as follows.

"[POLICE OFFICER]: Um, well see when [one of defendant's acquaintances] said he saw you and he was talkin' to you at the, there was a little girl standin' next to you. And he's walkin['] . . .

"ASHMUS: (Interrupting) you're gonna try to con-, now I ain't saying no more.

"[POLICE OFFICER]: Pardon?

"ASHMUS: You ain't gonna, no. I'm not gonna get accused of somethin'. I love people too much.

"[POLICE OFFICER]: Um hum.

"ASHMUS: I wouldn't even kill a fly, I'm sorry.

"[POLICE OFFICER]: Who said anything about killing anybody?

"ASHMUS: I wouldn't even hurt a fly or kill a fly, I'm sorry, don't say no more (inaudible) [—]

"[POLICE OFFICER]: (Interrupting) Troy, who said any-, who said anything about killing anybody?

"ASHMUS: The way you guys are talkin' to me, I'm sorry, it's what it sounds like.

"[POLICE OFFICER]: Nobody said anything about that. How come you're bringing that up[?]

"ASHMUS: He told me there's a serious offense.

"[POLICE OFFICER]: Who told you what's a serious offense?

"ASHMUS: The cop that told, brought me in.

"[POLICE OFFICER]: The uniformed officer?

"ASHMUS: Yeah.

"[POLICE OFFICER]: What did he tell you?

"ASHMUS: He told, I asked him what is my charge? He says there's been a serious offense occurred and you were a suspect, a sus-, suspect.

"[POLICE OFFICER]: Um hum."

As relevant here, defendant moved to suppress the final portion of the statement, from and including his interruption to the end. He claimed as follows: through the words, "now I ain't saying no more," and "don't say no more," he effectively invoked his right to silence; as a result, the final portion of the statement—together with the asserted invocations themselves—was inadmissible under *Miranda* and its progeny.

The trial court conducted an evidentiary hearing. The People offered the testimony of witnesses, including the police officer whose questions and comments are quoted above. They also presented the part of the statement they proposed to introduce at trial, both as audiotape-recorded and as transcribed. Defendant did not offer any evidence.

Determining in substance that defendant did not effectively invoke his right to silence, the trial court denied the motion. The People later introduced the part of the statement they had proposed, including its final portion, through both audiotape and transcript.

Defendant now contends that the trial court erred by denying his motion to suppress the final portion of the statement. His claim rises or falls with whether he effectively invoked his right to silence. On appeal, a trial court's resolution of such a question is reviewed independently. (*People* v. *Jennings* (1988) 46 Cal.3d 963, 979 [251 Cal.Rptr. 278, 760 P.2d 475].) So scrutinized, the court's determination here is sound. Within their context—

clearly in the transcript and more clearly still on the audiotape—defendant's words cannot reasonably be deemed an invocation of his right to silence. He spoke to his interrogators; he uttered the words in question; and without hesitation he proceeded to speak to them further. He evidently sought to alter the course of the questioning. But he did not attempt to stop it altogether.

B. *Denial of Motion to Exclude Electrophoretic Evidence Relating to Dried Semen Stains*

Prior to trial, defendant moved *in limine* to exclude evidence linking him to the attack on Marcie D. through the electrophoretic analysis of dried semen stains discovered on her body. He claimed that such evidence was inadmissible under the *Kelly-Frye* rule. (*People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C.Cir. 1923) 293 Fed. 1013 [34 A.L.R. 145].)

Under the *Kelly-Frye* rule as strictly defined, "admissibility of expert testimony based upon the application of a new scientific technique" depends on "a preliminary showing of general acceptance of the new technique in the relevant scientific community." (*People* v. *Kelly, supra*, 17 Cal.3d at p. 30, following *Frye* v. *United States, supra*, 293 Fed. at p. 1014.) Under the rule as more broadly stated, the admissibility of such evidence also requires (1) testimony as to general acceptance given by a person "properly qualified as an expert to give an opinion on the subject" (*People* v. *Kelly, supra*, at p. 30, italics deleted), and (2) testimony as to the use of "correct scientific procedures . . . in the particular case" (*ibid.*) given, of course, by a person properly qualified as an expert to give an opinion on *that* subject.

Of course, the party offering the evidence has the burden of proving its admissibility. (E.g., *People* v. *Morris, supra*, 53 Cal.3d at p. 206.) The weight of his burden is by a preponderance of the evidence. That is the general burden of proof "[e]xcept as otherwise provided by law . . . ." (Evid. Code, § 115.) No exception appears.

The trial court conducted an evidentiary hearing. The electrophoretic evidence in question showed that the semen found on Marcie's body could have been deposited by about 1.5 percent of the male Caucasian population, including defendant.

The People introduced evidence to satisfy the *Kelly-Frye* rule both as strictly defined and as more broadly stated, and made argument in support. They called two expert witnesses: Robert E. Garbutt, a criminalist with the

Sacramento County District Attorney's Laboratory of Forensic Services; and Brian Wraxall, a forensic serologist with the Serological Research Institute in Emeryville. By contrast, defendant offered no evidence and set forth virtually no argument.

The question was litigated in light of our decision in *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440], reversed on other grounds *sub nomine California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837], which had been handed down more than three months earlier. In *Brown*, we concluded that the trial court therein erred by ruling admissible, against a *Kelly-Frye* objection, certain evidence of the electrophoretic analysis of dried semen stains offered by the People. (40 Cal.3d at pp. 528-535.) Our reason was that the People failed to meet their burden in that particular proceeding as to the general acceptance of such analysis in the relevant scientific community, which we implied was forensic chemistry. (*Ibid.*)

After the evidentiary hearing, the trial court denied defendant's motion. It concluded, in substance, that the *Kelly-Frye* rule applied to the electrophoretic evidence in question, that the People met their burden, and hence that the evidence was admissible under the rule. Called at trial by the People, Garbutt subsequently testified on the basis of the electrophoretic analysis that the semen found on Marcie's body could have been deposited by about 1.5 percent of the male Caucasian population, including defendant.

Defendant now contends that the trial court's ruling was erroneous.

 On appeal, a *Kelly-Frye* ruling is reviewed independently. The reason is this: the core issue of the general acceptance of the new scientific technique in the relevant scientific community is scrutinized under that standard (*People* v. *Reilly* (1987) 196 Cal.App.3d 1127, 1134-1135 [242 Cal.Rptr. 496]). The resolution of each of the other questions underlying the ruling is reviewed under the test appropriate thereto. As relevant here, the determination on the qualifications of an expert is examined for abuse of discretion. (*People* v. *Kelly, supra,* 17 Cal.3d at p. 39.) This evidently extends to the expert who gives testimony on general acceptance—including the issues of his credentials and impartiality (*People* v. *Brown, supra,* 40 Cal.3d at p. 530). The determination on the use of correct scientific procedures in the particular case is also examined for abuse of discretion. (See *People* v. *Reilly, supra,* at pp. 1154-1155.)

 After independent review, we conclude that the trial court's ruling was proper. The People effectively conceded for purposes of defendant's

motion that the electrophoretic analysis of dried semen stains was a new scientific technique. They then proceeded to establish all that was required of them by a preponderance of the evidence. They showed the general acceptance of such analysis in the relevant scientific community of forensic chemistry. They offered the expert testimony of Wraxall to prove this point. They also offered the expert testimony of Garbutt to prove the use of correct scientific procedures in this case. Their evidence was sufficient.

Defendant challenges the ruling. As will appear, he is unsuccessful.

Defendant's attack is directed broadly at the determination of the general acceptance of electrophoretic analysis of dried semen stains in the relevant scientific community of forensic chemistry. But on the record made by the parties, the trial court expressly found such acceptance, and we independently agree.

Defendant's attack is directed specifically at Wraxall's qualifications to give an opinion on the subject. He finds fault with the witness's credentials and more fault still with his impartiality.

On this record, we find no abuse of discretion in the trial court's implicit determination that Wraxall was sufficiently credentialed. What is required here are "academic and professional credentials which equip [the witness] to understand both the scientific principles involved and any differences of view on their reliability." (*People* v. *Brown, supra,* 40 Cal.3d at p. 530.) The court could reasonably have found such credentials. Wraxall had extensive professional achievements and associations. Evidently, he had not earned all the academic degrees usually held by scientists in the field. But he had in fact done significant scientific work. Indeed, he had published several papers in refereed scientific journals.

On this record, we also find no abuse of discretion in the trial court's express determination that Wraxall was impartial. For present purposes, impartiality turns on whether the expert is "so personally invested in establishing the technique's acceptance that he might not be objective about disagreements within the relevant scientific community." (*People* v. *Brown, supra,* 40 Cal.3d at p. 530.) The court could reasonably have resolved the issue in the negative. To be sure, Wraxall had been involved in the development and promotion of electrophoretic analysis since the middle 1960's, both intellectually and financially. But such involvement does not appear fatal to the requisite objectivity.[10]

---

[10]Defendant claims in substance that the trial court's ruling was erroneous under the United States Constitution as well as the *Kelly-Frye* rule—specifically, the privilege against

## C. *Denial of Motions to Exclude Photographic Evidence*

Outside the presence of the jury, defendant made a motion to exclude certain photographs, some showing Marcie D. in life not long before the crimes, the others revealing defendant himself shortly thereafter. He made a separate motion to exclude certain photographs and slides of Marcie in death, as she appeared at the crime scene and during autopsy. In support of each, he claimed that the challenged evidence was not relevant under Evidence Code section 210 and, in any event, was excludable as unduly prejudicial under Evidence Code section 352. The People presented opposition, denying defendant's claims.

The trial court conducted a hearing on the photographs of Marcie in life and defendant himself. It reviewed the challenged evidence. Finding relevance and no undue prejudice, it denied the motion, ruled the photographs admissible, and subsequently received the items into evidence.

The trial court later conducted a hearing on the photographs and slides of Marcie in death. Here too it reviewed the challenged evidence. Although it apparently found all the items relevant, it found some unduly prejudicial. It granted the motion as to the items it found unduly prejudicial and ruled them inadmissible. Otherwise, it denied the motion, ruled the other items admissible, and subsequently received them into evidence.

Defendant contends that the trial court's rulings were erroneous.

■■■ "The appropriate standard of review is abuse of discretion. [Each of] [t]he ruling[s] comprises determinations as to relevance and undue prejudice. The former is reviewed under that standard. So is the latter." (*People* v. *Benson, supra,* 52 Cal.3d at p. 786, citation omitted.)

---

self-incrimination of the Fifth Amendment; the cruel and unusual punishments clause of the Eighth Amendment; and the due process clause of the Fourteenth Amendment.

We reject the point. "It is, of course, 'the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal.'" (*People* v. *Benson* (1990) 52 Cal.3d 754, 786, fn. 7 [276 Cal.Rptr. 827, 802 P.2d 330], quoting *People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048].) Defendant failed to make any objection whatever below based on any federal constitutional provision. In any event, the admission of the evidence did not substantially implicate any of the cited federal constitutional protections, and surely did not implicate the privilege against self-incrimination at all.

We note in passing that in *People* v. *Morris, supra,* 53 Cal.3d 152, 206-208, we held to the effect that the electrophoretic analysis of dried *blood*stains had obtained general acceptance in the relevant scientific community of forensic chemistry by the middle to late 1980's—which is, roughly, the time of the ruling under challenge. In this case, we need not and do not decide whether the same is true of the electrophoretic analysis of dried *semen* stains. We conclude only that the ruling here was proper on the record made by the parties.

■ As to the photographs and slides of Marcie in death—which we have ourselves reviewed—we discern no error.

The trial court did not abuse its discretion when it found the evidence relevant. "Because one of the theories on which the prosecution tried the case and on which the jury was instructed was premeditated murder, malice was material and the photographs [and slides] were relevant to that issue." (*People* v. *Hendricks* (1987) 43 Cal.3d 584, 594 [238 Cal.Rptr. 66, 737 P.2d 1350].) Contrary to defendant's argument, we think it plain that these items had at least some tendency to prove malice.

Neither did the trial court abuse its discretion when it found the evidence not unduly prejudicial. As stated, the photographs and slides were relevant. Although unpleasant, they were not gruesome. The court could reasonably have concluded that their prejudicial effect did not substantially outweigh their probative value.

■ As to the photographs of Marcie in life and defendant himself—which we have also reviewed—we arrive at the same result.

The trial court did not abuse its discretion when it found the evidence relevant. At the time of the ruling, the People intended to—and subsequently did—call a number of witnesses to give testimony bearing directly on identity and indirectly on intent to kill. They intended to—and did—use the photographs, at least in part, to support the witnesses' credibility. The testimony would—and did—link defendant and Marcie. The former had changed in appearance since the time of the crimes. The latter, of course, was dead. Obviously, identity and intent to kill were material. So was the credibility of the witnesses testifying thereon. The items in question had at least some tendency to prove those issues. Defendant argues that in his opening statement (which preceded both the receipt of any evidence and also the ruling in question) counsel conceded identity and thereby removed the issue from dispute. The concession, however, was ineffective.

Neither did the trial court abuse its discretion when it found the evidence not unduly prejudicial. As stated, the photographs were relevant. Moreover, they threatened no unfair detriment to defendant. The court could reasonably have concluded that their prejudicial effect did not substantially outweigh their probative value.[11]

---

[11]Defendant claims in effect that the trial court's rulings were erroneous under the United States Constitution as well as the Evidence Code—specifically, the Sixth Amendment, with its impartial-jury guaranty; the cruel and unusual punishments clause of the Eighth Amendment;

### D. *Prosecutorial Misconduct*

In his summation, the prosecutor explained to the jury why he called many witnesses and introduced many exhibits even though defense counsel conceded the issue of identity in his opening statement.

One reason, he said, was that the People bore the burden of proof and defense counsel's admission was not evidence and hence could not be used to meet that burden.

A second reason, he continued, was to disprove intoxication and its possible effect on the formation of intent to kill, if any such issue was raised.

"A third reason," he went on, was that "all that evidence . . . really puts Mr. Ashmus' defense in context. The strength of all the identification evidence explains why he changed his defense."

At this point, defense counsel objected that the prosecutor was "getting into an area here which is totally improper for closing argument." The prosecutor responded: "Well, he changed his story. I'll use the word 'story' if that's more palatable." Counsel replied: "My objection is in my opinion it is not more palatable and I am not acceding to the fact that the statement that it is—" The trial court interrupted: "I understand your objection. Objection overruled."

"My point," said the prosecutor as he returned to his argument, "is that the reason that Mr. Ashmus had changed his story, the initial, the story of complete and total denial of one of basically conforming his testimony to most of the evidence but *denying the mental state, the last refuge of the hopelessly guilty,* is because the evidence of his identification that he is in fact the person responsible for this crime was overwhelming." (Italics added.)

 Defendant now contends that the prosecutor committed misconduct by uttering the italicized phrase. He argues that the words amounted to an incorrect statement that the presumption of innocence—to which he was entitled under the due process clauses of the Fourteenth Amendment to the United States Constitution and article I, sections 7 and 15, of the California Constitution, as well as under Penal Code section 1096—was inapplicable in his case.

---

and the due process clause of the Fourteenth Amendment. We reject the point. At trial, defendant failed to make any objection whatever based on any federal constitutional provision. Be that as it may, as explained above, all the photographs and slides were relevant and none was unduly prejudicial. In our view, the admission of these items, whether considered separately or together, did not substantially implicate any of the cited federal constitutional protections.

We reject defendant's claim on procedural grounds. "It is, of course, the general rule that a defendant cannot complain on appeal of misconduct by a prosecutor at trial unless in a timely fashion"—and on the same ground—"he made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Benson, supra*, 52 Cal.3d at p. 794.) In this case, defendant made no such assignment and request. We recognize that counsel objected to the prosecutor's comments concerning the alleged change in the defense. But that objection cannot reasonably be construed to extend to the later remark complained of here. "It is true that the rule does not apply when the harm could not have been cured." (*Ibid.*) Such a situation, however, was not present here: any harm threatened was certainly curable.

We also reject the point on the merits. "What is crucial to a claim of prosecutorial misconduct is not the good faith *vel non* of the prosecutor, but the potential injury to the defendant. [Citation.] When, as here, the claim focuses on comments made by the prosecutor before the jury, a court must determine at the threshold how the remarks would, or could, have been understood by a reasonable juror. [Citations.] If the remarks would have been taken by [such] a juror to state or imply nothing harmful, they obviously cannot be deemed objectionable." (*People v. Benson, supra*, 52 Cal.3d at p. 793.)

A reasonable juror would have construed the complained-of phrase to mean that a "mental" defense can be asserted by all criminal defendants, even those for whom no defense is actually available. There is no cognizable harm in a remark like this. Such a juror would also have taken the words as a comment that defendant himself was guilty. "Comment of that sort is permitted if it is reasonably fair in light of the evidence." (*People v. Benson, supra*, 52 Cal.3d at p. 795.) The remark here was such.

A reasonable juror, however, could not possibly have construed the phrase—by itself or in context—to refer to the presumption of innocence, either expressly or impliedly, directly or indirectly. If such a juror had somehow adverted to the issue, he would have taken the words to mean that the presumption had been rebutted by the evidence presented by the People—surely a fair comment—and not that it was inapplicable in the first instance.

E. *Instruction on Consciousness of Guilt*

The trial court instructed the jury that "If you find that before this trial the defendant made willfully false or deliberately misleading statements concerning the charge upon which he is now being tried, you may consider such

statements as a circumstance tending to prove a consciousness of guilt but i[t] i[s] not suffic[i]ent of itself to prove guilt. The weight to be given to such a circumstance and its significance, if any, are matters for your determination."

 Defendant contends that the trial court erred by instructing as it did. He argues that the language quoted above defines a permissive inference, and that the permissive inference so defined is violative of the due process clause of the Fourteenth Amendment.

In part, we agree with defendant. Plainly, the instruction under challenge defines a permissive inference—to the effect that if the defendant lied about the crime, it may be inferred that he himself believed he was responsible therefor.

Otherwise, however, we disagree. "A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." (*Francis* v. *Franklin* (1985) 471 U.S. 307, 314-315 [85 L.Ed.2d 344, 353-354, 105 S.Ct. 1965], citing *Ulster County Court* v. *Allen* (1979) 442 U.S. 140, 157-163 [60 L.Ed.2d 777, 792-796, 99 S.Ct. 2213].) That condition is not met here. The conclusion suggested by the instruction—the defendant himself believed he was responsible for the crime—is altogether justified on proof of the predicate fact—the defendant lied about the crime.

Defendant claims that the challenged instruction did indeed define a permissive inference violative of the federal due process guaranty. His premise is, substantially, that the quoted language implied that if he lied about the attack on Marcie D., it might be inferred that he acted with intent to kill.

In deciding whether the point is sound, we must ascertain the meaning of the instruction. To do so, we must determine how a hypothetical "reasonable juror" would have, or at least could have, understood its words. (See *Cage* v. *Louisiana* (1990) 498 U.S. ___, ___ [112 L.Ed.2d 339, 341, 111 S.Ct. 328, 329] (per curiam) ["could have"]; *Francis* v. *Franklin, supra,* 471 U.S. at pp. 315-316 [85 L.Ed.2d at pp. 354-355] [same]; *People* v. *Warren, supra,* 45 Cal.3d at p. 487 ["would [have]"]; cf. *Boyde* v. *California* (1990) 494 U.S. 370, 378, 380 [108 L.Ed.2d 316, 328, 329, 110 S.Ct. 1190, 1197, 1198] [holding that "[t]he legal standard for reviewing jury instructions claimed to restrict impermissibly a jury's consideration of relevant evidence" under the Eighth Amendment "is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of" such evidence].)

Such a juror could not have understood the quoted language in conformity with defendant's premise. That defendant had effectively chosen to contest only intent to kill is of no consequence here. A reasonable juror simply could not have taken the words of the instruction to mean that lies by defendant supported an inference of intent to kill on his part. (Compare *People* v. *Griffin* (1988) 46 Cal.3d 1011, 1026-1027 [251 Cal.Rptr. 643, 761 P.2d 103] [rejecting a similar challenge against a similar instruction].)[12]

## IV. DEATH-ELIGIBILITY ISSUES

Defendant challenges the determination that he was subject to the death penalty. As relevant here, death eligibility is established when the defendant is convicted of murder in the first degree under at least one special circumstance. (Pen. Code, § 190.3.) Defendant was so convicted. As shown above, he has not successfully attacked the jury's guilty verdict. And as shown below, he does not successfully attack its special circumstance findings.

### A. *Denial of Motion to Compel Discovery of the People's Capital Prosecution Policies and Practices*

Prior to the change of venue from Sacramento to San Mateo County, defendant moved the court for an order compelling the People to provide discovery of the following information and material.

"(a) The name and case number of all murder complaints and informations filed in the Sacramento Municipal Court and the Sacramento Superior Court, respectively, in the last seven years.

"(b) A detailed description of how the prosecution generally decided to plead the aforementioned category of cases (i.e., how it chose to allege either second degree murder, first degree murder without special circumstances, or first degree murder with special circumstances).

"(c) A detailed description of how the prosecution generally decided what to allow the defendants to plead guilty to in the aforementioned category of cases.

"(d) Copies of all written matter of any sort that discuss or describe how murder cases should be plead [*sic*] or how murder cases should be resolved by plea.

---

[12]Defendant claims that the "error" under the due process clause of the Fourteenth Amendment, which bears on guilt, entails "error" under the cruel and unusual punishments clause of the Eighth Amendment, which bears on penalty. But as explained above, there was no error under the former provision.

"(e) The nature of the murder charges in the complaints and informations noted in paragraph 1 [*sic*] above (e.g., second degree murder, first degree murder without special circumstances, or first degree murder with special circumstances), and the plea bargain last offered by the prosecution to the defendant in each of these cases."

Defendant made his motion under the United States and California Constitutions—specifically, the cruel and unusual punishments clauses of the Eighth Amendment and article I, section 17; the due process clauses of the Fourteenth Amendment and article I, sections 7 and 15; and the equal protection clause of the Fourteenth Amendment and article I, section 7.

Defendant based his motion on a claim to the following effect: the policies (if any) and practices of the Sacramento County District Attorney with regard to the filing of special circumstance allegations and/or the seeking of the death penalty were, or at least might be, arbitrary and capricious. Subsequently, he purported to expand the ground of the motion to include a claim that these policies and practices revealed, or at least suggested, invidious discrimination—for example, against defendants, like himself, charged with the murder of a Caucasian victim. (As noted, defendant himself is Caucasian.)

Defendant sought the information and material described above in order "to sensibly present a motion to dismiss the special circumstances alleged herein, or to prohibit the prosecution from seeking death."

In aid of the showing he set out to make in support of his motion, defendant requested that the court order an evidentiary hearing, at which he intended to call, among other witnesses, the Sacramento County District Attorney and present and former members of his office.

The People opposed defendant's motion for discovery and his request for an evidentiary hearing.

After argument, the court denied both the motion and the request.

Defendant now contends that by so doing, the court erred.

A ruling on a motion to compel discovery—like that here—is subject to review for abuse of discretion. (See, e.g., *Hill* v. *Superior Court* (1974) 10 Cal.3d 812, 816-823 [112 Cal.Rptr. 257, 518 P.2d 1353, 95 A.L.R.3d 820].)

We find no abuse of discretion in this case. Of course, the party moving to compel discovery must provide, inter alia, a "plausible justifica-

tion" for the information and/or material he seeks. (*Ballard* v. *Superior Court* (1966) 64 Cal.2d 159, 167 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416]; accord, *Griffin* v. *Municipal Court* (1977) 20 Cal.3d 300, 306 [142 Cal.Rptr. 286, 571 P.2d 997].) The court could reasonably have concluded that defendant failed in this regard. Further, it could reasonably have concluded that he could not have supplied what was lacking after an evidentiary hearing. To be sure, the facts that he proffered showed that the Sacramento County District Attorney treated different defendants differently. But those facts were simply insufficient to support a claim that the district attorney's policies and practices might be arbitrary and capricious or invidiously discriminatory.

Defendant argues to the contrary, but he is unpersuasive. For example, he attacks the basis of the court's ruling. In denying his motion, the court stated that it was doing so "solely" under *Kennan* v. *Superior Court* (1981) 126 Cal.App.3d 576 [177 Cal.Rptr. 841].[13]

Defendant says that *Kennan* is factually inapposite. He is wrong. The record here, as summarized above, and the record there, as described on pages 579 to 581 of 126 Cal.App.3d, are similar.

Defendant then says that *Kennan* is legally unsound. Here too he is wrong. Contrary to his assertion, that opinion does not hold that prosecutorial policies and practices relating to the death penalty are immune from federal or state constitutional scrutiny. Given a reasonable reading, it simply stands for the unobjectionable proposition that the exercise of discretion in this area does not amount per se to a constitutional violation. (Compare *People* v. *Kennan* (1988) 46 Cal.3d 478, 504-507 [250 Cal.Rptr. 550, 758 P.2d 1081] [stating at p. 505 that "[a]s the opinion" in *Kennan* v. *Superior Court* "noted, prosecutorial discretion to select those eligible cases in which the death penalty will actually be sought does not in and of itself evidence an arbitrary and capricious capital punishment system or offend principles of equal protection, due process, or cruel and/or unusual punishment" under either the federal or state charter].)

B. *Instruction on Intent to Kill as to the Felony-murder Special Circumstances*

In *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 138-154 [197 Cal.Rptr. 79, 672 P.2d 862], we held that intent to kill was an element of the felony-murder special circumstance, and that the trial court was obligated to

---

[13]It appears that the court denied the motion as to paragraph (a) on the separate and independent ground that the information requested was "as readily available to [defendant] as to the district attorney's office . . . ."

so instruct. In *People* v. *Anderson, supra*, 43 Cal.3d at pages 1138-1147, we overruled *Carlos* and held that intent to kill was required for an aider and abettor but not for the actual killer, and that the court was under a duty to instruct accordingly. When the felony-murder special circumstance is alleged to have occurred after *Carlos* and before *Anderson,* the former governs. (E.g., *People* v. *Duncan* (1991) 53 Cal.3d 955, 973, fn. 4 [281 Cal.Rptr. 273, 810 P.2d 131], citing *In re Baert* (1988) 205 Cal.App.3d 514 [252 Cal.Rptr. 418] (per Arabian, J.).) This is such a case.

 Defendant contends that the trial court erred by instructing the jury as it did on intent to kill. He argues that its instructions on the issue were ambiguous and, as such, were inadequate.

In considering defendant's claim, we must address the following crucial question: Did the instructions adequately inform the jury of the requirement of intent to kill? To resolve this issue, as stated above, we must determine how a hypothetical "reasonable juror" would have, or at least could have, understood the charge.

In our view, the instructions more than adequately informed the jury of the requirement of intent to kill. A reasonable juror would have understood the charge as containing that requirement, and could not have construed it otherwise. The trial court declared in words whose meaning could hardly have been plainer: "To find that the special circumstances referred to in these instructions are true, it must be proved" "That the defendant intended to kill a human being"; and, "in each of the three special circumstances . . . , a necessary element is the existence in the mind of the defendant of the specific intent to unlawfully kill a human being . . . ."

Defendant argues to the contrary. But nothing to which he points in the record—including the charge as a whole and the arguments of counsel—is sufficient to undermine our conclusion. Certainly, nothing obscures the plain meaning of the words quoted above.

## V. PENALTY ISSUES

Defendant raises a number of claims for reversal of the judgment as to penalty. As will appear, none succeeds.

A. *Admission of Evidence of Defendant's Conviction of the Felony of Assault With Intent to Commit Rape and the Underlying Facts*

Immediately before the commencement of the penalty phase, defendant moved *in limine* to bar the introduction of evidence that he had been

convicted of the felony of assault with intent to commit rape against Lisa Cronin. The judgment in that case was entered after the commission of the capital and other offenses against Marcie D. (The attack on Cronin preceded the attack on Marcie by only hours.) At the time relevant here, the judgment in the Cronin case was on appeal. It was subsequently affirmed, and is now final. The existence *vel non* of prior felony convictions is an issue material to punishment under the 1978 death penalty law, specifically Penal Code section 190.3 (hereafter sometimes section 190.3). In support of his motion, defendant argued that a not-yet-final felony conviction is not a prior felony conviction within the meaning of section 190.3. The trial court denied the motion.

In their case in aggravation, the People called Cronin to present evidence relevant to another of the issues material to punishment under section 190.3—the existence *vel non* of other violent criminal activity. Cronin testified to the facts briefly and without apparent emotion. Defendant objected to Cronin's testimony as it was being given and moved to strike it when it was completed. His ground was in substance that the issue of other violent criminal activity did not embrace such activity *that resulted in a felony conviction*. The trial court overruled the objection and denied the motion.

At the close of their case in aggravation, the People moved into evidence an abstract of judgment showing defendant's conviction of the felony of assault with intent to commit rape. In response, defendant stated, "No objection." The trial court granted the motion and admitted the evidence.

▆▆▆ The law relevant here is as follows. The issue of other violent criminal activity covers all such activity—whether or not it results in a conviction. (*People* v. *Balderas* (1985) 41 Cal.3d 144, 201 [222 Cal.Rptr. 184, 711 P.2d 480].) The conduct, however, must violate a penal statute. (*People* v. *Boyd* (1985) 38 Cal.3d 762, 772 [215 Cal.Rptr. 1, 700 P.2d 782].) "The presence of such activity suggests that the capital offense is the product more of the defendant's basic character than of the accidents of his situation, whereas its absence suggests the opposite." (*People* v. *Gallego* (1990) 52 Cal.3d 115, 208-209, fn. 1 [276 Cal.Rptr. 679, 802 P.2d 169] (conc. opn. of Mosk, J.).)

The issue of prior felony convictions includes all such convictions— whether or not the offense was violent. (*People* v. *Balderas, supra*, 41 Cal.3d at p. 201.) The conviction, however, must be "entered before the capital crime was committed." (*Id.* at p. 203.) Like the presence or absence of other violent criminal activity, "the existence or nonexistence of previous convictions reflects on the relative contributions of character and situation. Further, the existence of such convictions reveals that the defendant had been taught,

through the application of formal sanction, that criminal conduct was unacceptable—but had failed or refused to learn his lesson." (*People* v. *Gallego, supra,* 52 Cal.3d at p. 209, fn. 1 (conc. opn. of Mosk, J.).)

The issues of other violent criminal activity and prior felony convictions, of course, are not mutually exclusive. As stated above, other violent criminal activity covers activity even if it results in a conviction. And prior felony convictions include convictions even if the underlying criminal activity was violent. (See *People* v. *Benson, supra,* 52 Cal.3d at pp. 787-788; *People* v. *Karis* (1988) 46 Cal.3d 612, 640 [250 Cal.Rptr. 659, 758 P.2d 1189]; *People* v. *Melton, supra,* 44 Cal.3d at p. 764.)

 Defendant now contends that the trial court erred by admitting the evidence of his conviction of the felony of assault with intent to commit rape. He argues that the evidence in question was inadmissible on the ground that a felony conviction entered after the capital offense—like that here—is not a prior felony conviction within the meaning of section 190.3.

We reject the claim at the threshold. The rule of timely and specific objection was not satisfied: at trial, defendant did not object on the ground that underlies his point here. Moreover, no exception to the rule is applicable—nor does defendant maintain otherwise.

We shall nevertheless address the merits. The determination crucial to the trial court's ruling is purely legal, dealing as it does with the coverage of section 190.3. As such, it is subject to the standard of independent review. (*People* v. *Louis* (1986) 42 Cal.3d 969, 985 [232 Cal.Rptr. 110, 728 P.2d 180], following *United States* v. *McConney* (9th Cir. 1984) 728 F.2d 1195, 1202 (in bank).) Applying that test, we find error. As stated, prior felony convictions within the meaning of section 190.3 are such convictions "entered before the capital crime was committed." (*People* v. *Balderas, supra,* 41 Cal.3d at p. 203.) The conviction here is not in this class.

Having found error, we must then consider its consequences. In *People* v. *Brown, supra,* 46 Cal.3d 432, we declared the following general rule: "state-law error at the penalty phase of a capital trial" (*id.* at p. 448) is not automatically reversible, but is subject to harmless-error analysis under the "reasonable possibility" standard. (See *id.* at pp. 446-448.) The rule applies to the kind of error here. (See *People* v. *Morales* (1989) 48 Cal.3d 527, 567 [257 Cal.Rptr. 64, 770 P.2d 244] [recognizing the applicability of harmless-error analysis to this sort of error without expressly employing the reasonable-possibility test].)

In conducting harmless-error analysis, we must ascertain how a hypothetical "reasonable juror" would have, or at least could have, been affected. (Cf. *Yates* v. *Evatt* (1991) 500 U.S. __, __ [114 L.Ed.2d 432, 111 S.Ct. 1884, 1893] [concluding that "to say that an [erroneous] instruction" was harmless under *Chapman* v. *California, supra,* 386 U.S. 18, "is to make a judgment about the significance of the [instruction] to reasonable jurors"].)

■■■ The record here discloses the following. Evidence of defendant's conviction of the felony of burglary was properly admitted as relevant to the issue of prior felony convictions. More important—as we shall presently show—evidence of the facts underlying defendant's conviction of the felony of assault with intent to commit rape was properly admitted as relevant to the issue of other violent criminal activity.

A reasonable juror could not have given defendant's conviction of the felony of assault with intent to commit rape any appreciable weight independent of its underlying facts.

■■ ■■ ■■ Accordingly, there is no reasonable possibility that the error here affected the outcome. (Compare *People* v. *Morales, supra,* 48 Cal.3d at p. 567 [finding a similar error harmless].)[14]

■■■ Defendant also contends that the trial court erred by admitting evidence of the facts underlying his conviction of the felony of assault with intent to commit rape. He argues that the issue of other violent criminal activity covers only the existence of such criminal activity and not the circumstances thereof. He then argues that even if the issue of other violent criminal activity does embrace the circumstances, such circumstances cannot include the result of the conduct—here, the fact that his attack caused a bruise and sprain to one of Cronin's arms. He then argues that the evidence

---

[14]Defendant claims that the admission of evidence of his conviction of the felony of assault with intent to commit rape was error under the United States Constitution as well as California law. He argues in substance that the admission of evidence inadmissible under state law is ipso facto offensive to the due process clause of the Fourteenth Amendment. He also argues that the admission of evidence of a not-yet-final conviction contravenes the cruel and unusual punishments clause of the Eighth Amendment. The point is not preserved for review. The rule of timely and specific objection was not met, and no exception appears. In any event, the point is without merit. Each of the supporting arguments is based on a premise that is manifestly unsound. A state-law violation is *not* automatically a violation of federal constitutional due process—and certainly, the violation here does not offend that guaranty. Also, the admission of evidence of a not-yet-final conviction does not, as a general matter, threaten a significant detrimental effect on the determination of penalty—nor did the evidence here pose such a threat.

that may be used to prove other violent criminal activity is limited and does not extend to testimony by a live witness.

Again, we reject the claim at the threshold. The rule of timely and specific objection was not met, and no exception appears.

Again, we shall nevertheless address the merits. The determination crucial to the trial court's ruling is purely legal, dealing as it does with the coverage of section 190.3 and the permissible manner of proof. As such, it is reviewed independently. So reviewed, it reveals itself to be proper. The issue of other violent criminal activity embraces not only the existence of such activity but also all the pertinent circumstances thereof. (*People* v. *Benson, supra*, 52 Cal.3d at p. 788.) Such circumstances may include the result of the conduct—and certainly include the bruise and sprain Cronin suffered here. Also, the evidence that may be used to prove other violent criminal activity is subject to no special limitation. (*Ibid.*) Surely, testimony by a live witness is not barred.[15]

---

[15]Defendant claims that the admission of evidence of the facts underlying his conviction of the felony of assault with intent to commit rape was error under the United States Constitution as well as California law.

The point is not preserved for review. The rule of timely and specific objection was not met, and no exception appears.

Be that as it may, the point lacks merit. In our view, the admission of evidence of the kind challenged here—whether or not testimonial—does not offend any provision of the United States Constitution. Heretofore, we have found no violation as to the Fifth Amendment, with its prohibition against double jeopardy (e.g., *People* v. *Melton, supra*, 44 Cal.3d at p. 756, fn. 17); the cruel and unusual punishments clause of the Eighth Amendment (e.g., *People* v. *Benson, supra*, 52 Cal.3d at pp. 788-789); the due process clauses of the Fifth and Fourteenth Amendments (*ibid.*); and the equal protection clause of the Fourteenth Amendment (*ibid.*). Today, we find no violation as to any other federal constitutional provision.

Defendant again maintains that the admission of evidence inadmissible under state law is ipso facto offensive to the due process clause of the Fourteenth Amendment. But again we note that a state-law violation is *not* automatically a violation of federal constitutional due process. In any event, the evidence here was not inadmissible under state law.

Defendant also claims that the admission of evidence of the facts underlying his conviction of the felony of assault with intent to commit rape was error under the California Constitution. The point is not properly raised: it is perfunctorily asserted without argument in support. (E.g., *People* v. *Marshall* (1990) 50 Cal.3d 907, 945, fn. 9 [269 Cal.Rptr. 269, 790 P.2d 676].)

In a related point, defendant claims that the court erred by ordering him to participate in a corporeal lineup for possible identification by Lisa Cronin. The court entered the order, on the People's motion, early in the life of this action, before venue was changed from Sacramento to San Mateo County. Defendant's present claim is reducible to an assertion that the admission of evidence of both his conviction of the felony of assault with intent to commit rape and the underlying facts was error under the due process clause of the Fourteenth Amendment on the ground that the identification procedure was unduly suggestive and unnecessary.

The point is not preserved: the rule of timely and specific objection was not met, and no exception appears. It is true that defendant expressed misgivings about the identification

B. *Discharge of a Juror*

Defendant contends that the trial court erred by discharging a juror at the juror's request in the midst of the penalty phase.

Penal Code section 1089 provides in relevant part that "If at any time, whether before or after the final submission of the case to the jury, . . . a juror requests a discharge and good cause appears therefor, the court may order him to be discharged and draw the name of an alternate, who shall then take his place in the jury box . . . ."

About 8:05 a.m. one day during the penalty phase, one of the jurors, Fred C. Godfrey, telephoned the trial court. He requested discharge from jury service because of the unexpected death of his mother the previous night. The court granted his request and ordered him discharged. (At that time, four of the five alternate jurors originally sworn remained available for service.) Evidently, the communication between the court and Godfrey was effected through the court clerk.

Within the hour, the trial court notified the People and defendant of the foregoing events in chambers. Immediately thereafter, in open court outside the presence of the jury, defendant objected to the discharge of Juror Godfrey and moved for reconsideration. In his argument, counsel stated the grounds to the following effect: although the death of Godfrey's mother did indeed provide good cause to continue the trial to accommodate Godfrey, it might not provide good cause to excuse him outright. He suggested that the court speak directly with Godfrey to determine whether a continuance of about a week would enable him to stay on. He made plain that he wanted Godfrey to remain—and that he believed the prosecutor wanted him to go.

The trial court impliedly overruled defendant's objection and expressly denied his motion to reconsider. It stated that its "ruling with respect to Mr. Godfrey is made without consideration as to anyone's desire for him as a juror, favorable or unfavorable to either side. It matters not to the court." It added: "Seems unreasonable to think that we should delay this case any further, considering its rather chopped up time sequence, another four [court] days simply to satisfy someone's desire for a certain juror when we have four alternates."

Thereupon, in open court in the presence of the jury, the trial court ordered the court clerk to draw the name of one of the alternate jurors at random. The

---

procedure in opposing the People's lineup motion. But he did so only briefly and more than a year and a half before the evidence was offered at the penalty phase. On this record, such an "objection" is insufficient.

name drawn was that of Jerome N. Severance. The court directed Severance to take Juror Godfrey's place in the jury box. Defendant did not attempt to challenge Severance and raised no objection whatever. During jury selection, he had made no "for cause" challenge against Severance. Neither had he made a peremptory challenge, although he had such challenges remaining.

As stated, defendant claims that the trial court erred by discharging Juror Godfrey at Godfrey's request. A ruling of this sort is subject to review under the abuse-of-discretion standard. (See *In re Mendes* (1979) 23 Cal.3d 847, 852 [153 Cal.Rptr. 831, 592 P.2d 318].) Applying that test, we find no error. It was not unreasonable for the court to act as it did. As a general matter at least, the death of a juror's mother constitutes good cause to discharge the juror—and not merely to continue the trial—when, as here, he so requests. As defense counsel observed, a mother's death is "obviously . . . a tragic and disturbing event." Defendant now challenges the record on which the court acted and the procedures that it followed. But after close consideration, we conclude that his attack fails: the record was sufficient and the procedures adequate. The court conducted itself well within its discretion. (Compare *In re Mendes, supra,* at p. 852 [rejecting a similar claim based on the court's discharge of a juror at her own request following the death of her brother].)[16]

## C. *Prosecutorial Misconduct*

Defendant contends that the prosecutor committed misconduct on three occasions during his summation. We shall consider his complaints seriatim.

### 1. *Comments on Defendant's Past Sexual Activity*

At the penalty phase, defendant called as his last witness Richard Michael Yarvis, M.D., a psychiatrist, to give expert opinion testimony regarding his background and character. In forming his views, Dr. Yarvis relied on face-to-face meetings with defendant and/or counsel and on the review of documents of various sorts and the live testimony of other witnesses.

---

[16]Defendant claims that the trial court's discharge of Juror Godfrey was error under the United States Constitution as well as California law. The point is not preserved. As a general rule, a defendant may properly raise in this court a point involving a trial court's allegedly improper discharge of a juror only if he made the same point below. (Cf. *People v. Gallego, supra,* 52 Cal.3d at p. 166 [applying the requirement of a contemporaneous and specific objection to a claim involving a prosecutor's alleged use of peremptory challenges to remove prospective jurors on the sole ground of group basis in violation of Cal. Const., art. I, § 16].) Plainly, defendant does not satisfy the rule as to the claim resting on the United States Constitution: he made no objection whatever on federal constitutional grounds. Neither does he show that any exception to the requirement is available.

On direct examination, Dr. Yarvis purported "to provide a kind of overview or synthesis or explanatory vehicle, if you will, a chronology of the symptoms and impairments on the one hand, and the list of what . . . can be reasonably construed to be relevant factors, . . . on the other hand, nothing more, nothing less."

On cross-examination, Dr. Yarvis declined an invitation by the prosecutor to diagnose defendant as a sadist or sado-masochist. During the questioning, he was probed as to his knowledge of various alleged instances of sexual activity on defendant's part—of which there was no evidence in the record—including the following: defendant handcuffed and spanked a girl named Wendy B. against her will when she was about 15 years old; he whipped another girl named Kim S., who bore him a child, and asked her to whip him in return; he requested Kim S. to insert a table leg into his rectum; and he manipulated the anus of an 18-month-old child.

In the course of his summation, the prosecutor made the following comments.

"When the defendant testified he noted that Marcie had tears in her eyes while he was assaulting her, . . . and that raises a question in my mind and I hope in yours.

"As the defendant was assaulting Marcie, as he was sexually raping her and sodomizing her, was he watching and enjoying what he was doing?

"Was he getting sadistic satisfaction in what he was doing? What was his motivation in doing those horrible and cruel things to her?

"I asked Dr. Yarvis about that. I asked him what he thought of it in light of the past history which he acknowledged in cross-examination consists of molestation of an eighteen month-old [sic] and spanking the other[,] Wendy [B.], . . . the whipping he asked of and did to Kim [S.], the mother of his child.

"I think there is considerable evidence in this case, evidence that Dr. Yarvis was happy to gloss over but evidence, nevertheless, that the defendant does and did take sadistic satisfaction in what he did to Marcie [D.].

"I found it very interesting that there was so many semen over Marcie's abdomen. There was semen in her vagina as well and in her rectum, but it is apparent that the defendant did not ejaculate fully inside Marcie.

"He ejaculated at least one time over her; how else can we explain the semen on her abdomen?

"What was the defendant looking at and thinking about as he ejaculated over Marcie [D.] onto her abdomen?

"I don't believe it is an unfair inference or a stretching of the evidence to suggest to you that the defendant was using Marcie in a perverse way.

"He didn't think that Marcie was a girlfriend. He was not making love to her as though he would make love to a girlfriend."

 Defendant now contends that through the comments about his "past history," the prosecutor committed misconduct. He argues that the remarks went beyond the evidence in the record in contravention of California law; they thereby offended the Sixth Amendment, with its right of confrontation; and as a result, they violated the cruel and unusual punishments clause of the Eighth Amendment.

We reject the claim at the threshold. The rule of timely and specific assignment of misconduct and request for admonition was not satisfied. To be sure, after the prosecutor's summation defense counsel did in fact make an unsuccessful assignment and request on the ground that the complained-of comments incorrectly stated or implied that crimes other than burglary and assault with intent to commit rape could be considered in aggravation. But he did not make the assignment and request on the ground that underlies his point here.[17] Moreover, the exception to the rule is inapplicable. Any harm threatened by the remarks—which were relatively isolated and unemphatic—was certainly curable.

We shall also address the merits.

The question does not appear to be difficult so far as the United States Constitution is concerned. The complained-of comments seem not to have offended defendant's Sixth Amendment confrontation right. Apparently, "the prosecutor here . . . introduced no statements made by persons unavailable for questioning at trial." (*Donnelly* v. *DeChristoforo* (1974) 416 U.S. 637, 643, fn. 15 [40 L.Ed.2d 431, 437, 94 S.Ct. 1868]; accord, *People* v. *Bell* (1989) 49 Cal.3d 502, 534 [262 Cal.Rptr. 1, 778 P.2d 129].) Neither do the remarks seem to have violated the Eighth Amendment prohibition against cruel and unusual punishments. As noted, they were relatively isolated and unemphatic.

By contrast, the question is somewhat closer so far as California law is concerned. It is settled that "a prosecutor may not go beyond the

---

[17]We note in passing that in its penalty phase charge, the trial court instructed the jury that "You may not consider any evidence of any . . . crime" other than burglary and assault with intent to commit rape "as an aggravating circumstance."

evidence in his argument to the jury." (*People* v. *Benson, supra,* 52 Cal.3d at p. 794.) The prosecutor here seems to have done so. It is certainly conceivable that a reasonable juror could have understood the comments as stating or implying—incorrectly—that there was evidence in the record supporting the mentioned instances of sexual activity on defendant's part.

But even if we were to find misconduct, we would not reverse. Certainly, any failing here is not prejudicial per se, but rather is subject to harmless-error analysis. Whether it violates state law only or implicates the United States Constitution as well is immaterial. It is harmless under both *Brown*'s "reasonable possibility" standard and *Chapman*'s "reasonable doubt" test—which, as noted, are the same in substance and effect. The gist of the prosecutor's argument was that defendant "does and did take sadistic satisfaction in what he did to Marcie [D.]." Comment of that sort was permissible: it was reasonably fair in light of the evidence. Considered in their context, the remarks here challenged were brief and essentially inconsequential. Defendant argues that some standard stricter still than *Chapman*'s applies to Eighth Amendment violations. ██ ██ That is not the case. (See *People* v. *Lucero* (1988) 44 Cal.3d 1006, 1031-1032 [245 Cal.Rptr. 185, 750 P.2d 1342].)[18]

### 2. *Comments Relating to the Victim*

 Defendant claims that through certain comments bearing on Marcie D.'s personal characteristics and the emotional impact of the crime on her family and others, the prosecutor committed misconduct under both California law and the United States Constitution—specifically, section 190.3 and the cruel and unusual punishments clause of the Eighth Amendment.

We reject the point on procedural grounds insofar as it is based on section 190.3. The rule of timely and specific assignment of misconduct and request for admonition was not satisfied. Defense counsel did indeed make an unsuccessful assignment and request on the ground that the prosecutor incorrectly presented the "sentiments" and "[o]utrage" of the Sacramento community as a circumstance in aggravation. But he did not make an

---

[18]In a related point, defendant claims that the trial court erred by refusing to admonish or instruct the jury to the effect that questions and answers about matters not in evidence did not constitute evidence—or more specifically, that the prosecutor's questions and Dr. Yarvis's answers about defendant's alleged sexual activity did not constitute evidence. There was, however, no request. He then claims that the court erred by failing to give such an admonition or instruction sua sponte. In our view, no requirement to so admonish or instruct is imposed by California law or the United States Constitution. Whether or not such a requirement exists under federal statutory and decisional law—as defendant argues that it does—is not dispositive: that law simply does not govern here.

assignment and request on the ground that underlies his point here.[19] Moreover, the exception to the rule is inapplicable. We cannot conclude that any harm threatened by the comments here was incurable. Indeed, the remarks focused on the nature and circumstances of the crime and the effect on the victim—topics that were altogether proper (*People* v. *Benson, supra,* 52 Cal.3d at p. 797).

We reject the point on the merits insofar as it is based on the cruel and unusual punishments clause of the Eighth Amendment.

In *Booth* v. *Maryland* (1987) 482 U.S. 496, 502-509 [96 L.Ed.2d 440, 448-453, 107 S.Ct. 2529], the United States Supreme Court concluded that the introduction of evidence concerning such matters as the victim's personal characteristics, the emotional impact of the crime on the victim's family, and the opinions of family members about the crime and the criminal—except to the extent it related directly to the circumstances of the crime—was violative of a criminal defendant's rights under the cruel and unusual punishments clause, and that accordingly such evidence was inadmissible per se. In *South Carolina* v. *Gathers* (1989) 490 U.S. 805, 810-812 [104 L.Ed.2d 876, 882-884, 109 S.Ct. 2207], the court followed *Booth* and concluded that the presentation of argument relating to such matters was violative of those same rights and as such was improper per se.

But recently, in *Payne* v. *Tennessee* (1991) 501 U.S. __ [115 L.Ed.2d 720, 111 S.Ct. 2597], the court overruled Booth and Gathers to the extent that they held that evidence or argument relating to the victim's personal characteristics or the emotional impact of the crime on the victim's family was inadmissible or improper per se. (*Id.* at p. __ [115 L.Ed.2d at p. 730, 111 S.Ct. at p. 2611].) ▮ Of course, "a new [federal constitutional] rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." (*Griffith* v. *Kentucky* (1987) 479 U.S. 314, 328 [95 L.Ed.2d 649, 661, 107 S.Ct. 708].) ▮▮▮ *Payne* is such a rule and this is such a case.[20]

---

[19]We note in passing that in its penalty phase charge, the trial court instructed the jury on the circumstances in aggravation it deemed applicable to this case—which did *not* include the "sentiments" and "[o]utrage" of the Sacramento community—and then added at defendant's request: "I have previously read to you the list of aggravating circumstances which the law permits you to consider if you find that any of them is established by the evidence. *These are the only aggravating circumstances that you may consider. You are not allowed to take account of any other facts or circumstances as the basis for deciding that the death penalty would be an appropriate punishment in this case.*" (Italics added, paragraphing omitted.)

[20]Defendant also claims that the prosecutor's comments misstated, conflicted with, or went beyond the evidence in certain particulars, and as a result amounted to misconduct. We

### 3. Comments on Remorse

At the guilt phase, defendant testified to the effect that he felt remorse and shame for his attack on Marcie D., apparently from the very moment he did the deed.

In the course of his summation, the prosecutor commented that "When we consider the nature and circumstances of the defendant's crime, we should also look to the matter of remorse and shame. The defendant testified that he was ashamed of what he had done. Certainly, that is something for you to consider, whether you believe it or not, so let's look at this conduct after the crime." (Paragraphing omitted.) The prosecutor then went on to review that conduct. He drew the inference therefrom that defendant's testimony on remorse and shame was a lie. In transition, he stated, "I'd like to turn, for a few moments, to the other aggravating factors in this case," and proceeded to discuss defendant's felony convictions of assault with intent to commit rape and burglary and the underlying facts.

■ Defendant claims that through the transitional comment quoted above, the prosecutor committed misconduct under California law by arguing that the absence of remorse amounted to a circumstance in aggravation. Such an argument would, of course, have been improper. The presence of remorse is mitigating under the 1978 death penalty law. (E.g., *People* v. *Dyer* (1988) 45 Cal.3d 26, 82 [246 Cal.Rptr. 209, 753 P.2d 1].) Its absence, however, is generally not aggravating. (See *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1231-1232 [275 Cal.Rptr. 729, 800 P.2d 1159]; *People* v. *Kennan, supra,* 46 Cal.3d at p. 510.) A reasonable juror would have understood the prosecutor's remarks to argue that contrary to defendant's claim, remorse was lacking as a circumstance in mitigation. Such an argument is

disagree. Each of the remarks here challenged constituted a reasonable inference from the evidence, or a fair comment thereon, or both. As noted above, fair comment is proper. So too is reasonable inference. (E.g., *People* v. *Bandhauer* (1970) 1 Cal.3d 609, 616 [83 Cal.Rptr. 184, 463 P.2d 408].)

Defendant then broadly claims in effect that the misconduct he discerns "arbitrar[ily] depriv[ed]" him of a "substantial and legitimate expectation" arising from section 190.3 that he would be "deprived of his [life or] liberty only to the extent determined by the jury in the exercise of its statutory discretion" (*Hicks* v. *Oklahoma* (1980) 447 U.S. 343, 346 [65 L.Ed.2d 175, 180, 100 S.Ct. 2227]), and hence violated his right to due process of law under the Fourteenth Amendment. There was simply no such deprivation, arbitrary or otherwise.

In a related point, defendant claims that the trial court erred by failing to admonish or instruct the jury sua sponte to the effect that in determining penalty, they should not consider such matters as the victim's personal characteristics, the emotional impact of the crime on the victim's family, and the opinions of family members about the crime and the criminal—or more specifically, that they should not take into account any evidence or argument bearing on these topics. No requirement to so admonish or instruct is imposed by California law or the United States Constitution. In any event, as noted the court instructed that the listed aggravating circumstances—which did *not* include the foregoing matters—were exclusive.

proper. (*People* v. *McLain* (1988) 46 Cal.3d 97, 112 [249 Cal.Rptr. 630, 757 P.2d 569].) A reasonable juror could not have taken the challenged comment to carry the meaning defendant assertedly discovers therein. Such a juror would have heard the words for what they were: a transition between the aggravating circumstance involving the capital offense itself and the aggravating circumstances involving other violent criminal activity and prior felony convictions.[21]

### D. *Instructions on the Determination of Penalty*

Defendant contends that the trial court committed various errors by instructing the jury as it did on the determination of penalty. We shall consider the claims seriatim.

#### 1. *Instruction on Sympathy, Pity, or Mercy*

■ At defendant's request, the trial court instructed the jury that "In your determination of what punishment to impose, you may consider sympathy, pity, or mercy."

Nevertheless, defendant now claims that the instruction was erroneous. His argument is that at least on the facts of this case, its words were ambiguous: Did they cover only defendant? Or did they extend—impermissibly—to the victim and perhaps others as well?

We disagree. A reasonable juror would have understood the instruction under challenge to allow consideration of sympathy, pity, or mercy *only for defendant* in deciding whether to take or spare his life. Such a juror could not have taken the language to carry the meaning defendant asserts it suggested. The "defendant only" coverage of the instruction is practically declared by the words themselves. It is also confirmed by their context. Indeed, one of the instructions, which was given at defendant's request, stated that the listed circumstances in aggravation—which did *not* include sympathy, pity, or mercy for the victim or others—were exclusive.

Defendant concedes that "There was nothing wrong with the sympathy instruction" in itself. But he goes on to assert that there was something wrong when it was set against the prosecutor's comments relating to the

---

[21]Defendant claims that the prosecutor's comment under challenge here was misconduct under the United States Constitution as well as California law. He argues that the presentation of argument improper under California law is ipso facto offensive to the due process clause of the Fourteenth Amendment. But as noted, a state-law violation is *not* automatically a violation of federal constitutional due process. In any event, the argument here was not improper under California law.

victim. We are not persuaded. The remarks were simply insufficient to preemptively undermine the instruction.[22]

### 2. *Refusal to Give a Requested Instruction on the Meaning of Life Imprisonment Without Possibility of Parole*

Defendant requested the trial court to give "Defendant's Proposed Instruction No. 23": "A sentence of life without the possibility of parole means that the defendant will remain in state prison for the rest of his life and will not be paroled at any time." In support, counsel stated: "I think it's an area that the court covered with every juror in voir dire, and I think that it's concise enough that—and not confusing enough that they should—it's a proper instruction." The prosecutor objected. The court refused: "I think this is a matter with respect to imprisonment, what it means, and what death penalty means, and commutation and all that, what all of that means. I think it would run afoul of the *Ramos* decision. We will confront that situation if and when it occurs, if requested by the jury." (Italics added, paragraphing omitted.)

■■■ Defendant contends that the trial court erred by refusing the requested instruction. Not so. A court may not give an instruction that is incorrect. (See, e.g., *People* v. *Gordon, supra,* 50 Cal.3d at p. 1275.) And it is incorrect to declare that the sentence of life imprisonment without possibility of parole will inexorably be carried out. (*People* v. *Thompson, supra,* 45 Cal.3d at p. 130.) The instruction here would effectively have made just such a declaration.

Defendant argues that the requested instruction was in fact correct in its entirety. He says that it would have done no more than explain and clarify the meaning of the sentence of life imprisonment without possibility of parole. It would have done much more. It would have stated all but expressly that the penalty would inexorably be carried out.

Defendant then argues that the requested instruction was correct at least in part: "A sentence of life without the possibility of parole means that the defendant . . . will not be paroled at any time." The quoted language is arguably ambiguous. To determine its meaning, as noted above, we must determine how a hypothetical "reasonable juror" would have, or at least

---

[22]Defendant also broadly claims in effect that the "error" "arbitrar[ily] depriv[ed]" him of a "substantial and legitimate expectation" arising from section 190.3 that he would be "deprived of his [life or] liberty only to the extent determined by the jury in the exercise of its statutory discretion" (*Hicks* v. *Oklahoma, supra,* 447 U.S. at p. 346 [65 L.Ed.2d at p. 180]), and hence violated his right to due process of law under the Fourteenth Amendment. But there was no error. Hence, there was no such deprivation, arbitrary or otherwise.

could have, understood its words. Such a juror apparently would have—and certainly could have—taken the language to mean that the penalty would inexorably be carried out.

Finally, defendant may be understood to argue that because he requested the trial court to instruct on the meaning of the sentence of life imprisonment without possibility of parole, the court was obligated to give an instruction of that kind. Before today, we have never held that such a request triggers such an obligation. And we decline to so hold now. We recognize that in *People* v. *Thompson, supra,* 45 Cal.3d at page 131, we implied in dictum that if the defendant tenders an instruction that "correctly inform[s] the jury that whether or not there [are] circumstances that might preclude either the death penalty or life without possibility of parole from being carried out, they should assume it would be carried out for purposes of determining the appropriate sentence for this defendant, such instruction should [be] given." Defendant did not tender an instruction of this kind here.

Defendant goes on to claim that the trial court erred by failing to instruct sua sponte on the meaning of the sentence of life imprisonment without possibility of parole. In *People* v. *Bonin* (1988) 46 Cal.3d 659, 698 [250 Cal.Rptr. 687, 758 P.2d 1217], we concluded that a similar omission was not erroneous. We come to the same conclusion here. In our view, the court was under no obligation to give an instruction on life imprisonment without possibility of parole on its own motion. Its failure to do so, therefore, was not error. (See *People* v. *Benson, supra,* 52 Cal.3d at p. 799 [implying that it is not error for a court to fail or refuse to give an instruction it is not required to give].)

Defendant argues to the contrary. In so doing, he relies on *People* v. *Bonin, supra,* 46 Cal.3d 659. He reads our opinion to stand for the proposition that if the "jurors share a 'common and widespread misconception' that the sentence of 'confinement in the state prison for life without possibility of parole' does not actually mean confinement for life *without possibility of parole,*" they "should be instructed on the court's own motion that 'without possibility of parole' means 'without possibility of parole.' " (*Id.* at p. 698, italics in original.) He proceeds to interpret the record to reveal that the jurors here shared just such a "common and widespread misconception."

We are not persuaded. Defendant's reading of *Bonin* is not supported. Our opinion simply does not stand for the proposition referred to. Rather, it addresses and rejects an argument in which the defendant urged us— unsuccessfully—to adopt that "rule." Similarly unsupported is defendant's

interpretation of the record here. Recall that at individual sequestered voir dire, the trial court and/or defense counsel and/or the prosecutor generally "instructed" the prospective jurors—including, specifically, all who were subsequently sworn to serve as jurors or alternates—that the sentence of life imprisonment without possibility of parole meant life imprisonment *without possibility of parole*. Also recall that in so doing, they sometimes suggested —favorably to defendant, but inaccurately—that the penalty would inexorably be carried out. We acknowledge, as noted above, that as a group the prospective jurors did not enter or leave voir dire with a *technical* knowledge of life imprisonment without possibility of parole. But as also noted, the record shows that they obtained an understanding adequate for their purposes. We cannot conclude that the jurors here shared the "common and widespread misconception" defendant asserts they did.[23]

### 3. *Failure to Instruct on "Overlapping" Special Circumstances*

The trial court instructed the jury that in determining penalty, they should consider, inter alia, "The circumstances of the crime of which the defendant has been convicted in the present proceeding and the existence of any special circumstances found to be true." The ultimate source of the foregoing language is, of course, section 190.3. As also noted, the jury found all three special circumstance allegations—which arose out defendant's single attack on Marcie D.—to be true: felony-murder-rape, felony-murder-sodomy, and felony-murder-lewd conduct.

Defendant contends that the trial court erred by failing to instruct the jury sua sponte that they should not take into account the felony-murder-lewd conduct special circumstance. We disagree.

The legal premise of defendant's argument fails. Contrary to his assertion, neither California law nor the United States Constitution bars the consideration of special circumstances that "overlap," i.e., that arise out of a single course of conduct. (*People v. Melton, supra*, 44 Cal.3d at pp. 765-768.)

The factual premise of defendant's argument fails as well. Again contrary to his assertion, the felony-murder-lewd conduct special circumstance here is not necessarily reducible to either or both of the other special circumstances,

---

[23]Defendant claims in substance that the omission of an instruction on the meaning of the sentence of life imprisonment without possibility of parole violated the Sixth Amendment, with its impartial-jury guaranty; the cruel and unusual punishments clause of the Eighth Amendment; and the due process clause of the Fourteenth Amendment. In our view, the meaning of the penalty is pellucid. The lack of further explanation did not implicate any of the cited provisions.

viz., felony-murder-rape and felony-murder-sodomy. At the guilt phase, the People introduced evidence that defendant may have committed forcible oral copulation on Marcie by inserting his penis into her mouth. We recognize that the evidence—the presence of a single sperm cell in her mouth—was not overwhelming. But it was sufficient. Indeed, defendant testified that although he did not "think" that he had done the act, "it may have been a possibility . . . ."

■ Next, defendant contends that the trial court erred by failing to instruct the jury sua sponte that they should not consider the acts comprising rape, sodomy, and lewd conduct under both "[t]he circumstances of the crime" and "the existence of any special circumstances found to be true."

The trial court's instructional omission in this case was not error. "[W]hen . . . the instruction under challenge is adequate, the court is under no obligation to amplify or explain in the absence of a request." (*People* v. *Bonin, supra*, 46 Cal.3d at p. 700.) The instruction here was such. Of course, as defendant argues, the same conduct may not be "counted" under both "[t]he circumstances of the crime" and "the existence of any special circumstances found to be true" without offense to section 190.3. (*People* v. *Melton, supra*, 44 Cal.3d at p. 768.) Strictly speaking, it is under the heading of "[t]he circumstances of the crime" that section 190.3 covers the conduct underlying a special circumstance; under the heading of "the existence of any special circumstances found to be true," it reaches merely the presence of any such special circumstances. We believe that as a general matter at least, a hypothetical "reasonable juror" would understand an instruction like the present to allow only "single counting." We further believe that such a juror would have so understood the instruction here. The language directs attention to "[t]he *circumstances* of the crime" and "the *existence* of any special circumstances found to be true"—but not to the "*circumstances* of the special circumstances." (Italics added.)

All the same, an instruction such as that given by the trial court in this case "might conceivably" be taken by a jury to permit "double-count[ing]" (*People* v. *Melton, supra*, 44 Cal.3d at p. 768) if its language were construed loosely to refer to "the *circumstances* of the special circumstances" as well as "the circumstances of the crime." (Italics added.) In view of such an eventuality, we have stated that "On defendant's request, the trial court should admonish the jury not to [double-count]." (*Ibid.*) Here, defendant made no such request.

### 4. *Instruction of the Circumstances of the Crime, Other Violent Criminal Activity, and Prior Felony Convictions*

The trial court instructed the jury that in determining penalty, they should consider, inter alia, (1) "The circumstances of the crime of which the

defendant has been convicted in the present proceeding and the existence of any special circumstances found to be true"; (2) "The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence, or the express or implied threat to use force or violence"; and (3) "The presence or absence of any felony convictions." The ultimate source of the foregoing language is, of course, section 190.3. The words of the instruction differ from those of the statute on only one point significant here: the former refer to "any" felony convictions, the latter to "any *prior*" felony convictions (italics added).

 The scope of the three applicable penalty factors defined by section 190.3 is established. Plainly, the factor involving the circumstances of the present crimes covers the offenses of which the defendant is convicted in the capital proceeding. (E.g., *People* v. *Bonin*, *supra*, 46 Cal.3d at p. 703.) By contrast, the factor relating to other violent criminal activity embraces such activity *other than* that underlying the offenses in the capital proceeding. (E.g., *People* v. *Miranda* (1987) 44 Cal.3d 57, 105-106 [241 Cal.Rptr. 594, 744 P.2d 1127].) Similarly, the factor pertaining to prior felony convictions includes such convictions *other than* those in the capital proceeding (*ibid.*) —so long as they were "entered before the capital crime was committed" (*People* v. *Balderas*, *supra*, 41 Cal.3d at p. 203).

 Defendant contends that the trial court's instruction on the penalty factors of other violent criminal activity and prior felony convictions was erroneous. Specifically, he argues that the instruction incorrectly or at least inadequately delimited the scope of each of those factors.

As explained above, in deciding whether a claim such as the present is sound, we must ascertain the meaning of the instruction and to do so, we must determine how a hypothetical "reasonable juror" would have, or at least could have, understood its words.

After close consideration, we find no error in the instruction on the penalty factor of other violent criminal activity. A reasonable juror would have understood its words to refer to violent criminal activity *other than* that underlying the offenses in the present proceeding. Such a juror could not have taken the language to reach further. The instruction on the penalty factor of the circumstances of the present crimes allowed full consideration of each and every one of those offenses. A reasonable juror could not have believed that the instruction in question allowed any *re*consideration whatever. (Compare *People* v. *Brown*, *supra*, 46 Cal.3d at p. 457 [arriving at substantially the same conclusion regarding substantially the same instruction].)

■■■ We reach the opposite result as to the instruction on the penalty factor of prior felony convictions.

To be sure, a reasonable juror would have understood the words of the instruction—even without the statutory adjective "prior"—to refer to felony convictions *other than* those in the present proceeding, and could not have been led to expand their compass. As stated above, the instruction on the penalty factor of the circumstances of the present crimes allowed full consideration of those offenses, and a reasonable juror could not have believed that the instruction here allowed reconsideration. (Compare *People v. Miranda, supra,* 44 Cal.3d at p. 106 [arriving at a similar conclusion regarding a similar instruction].)

A reasonable juror, however, would undoubtedly have understood the instruction's language to embrace defendant's conviction of the felony of assault with intent to commit rape. But that conviction, entered as it was after the commission of the capital offense, is outside the scope of the penalty factor here.

Having found error on this point, we must consider its consequences. Just as the improper admission of prior-felony-conviction evidence at the penalty phase is subject to harmless-error analysis under the "reasonable possibility" standard, so too, we believe, is improper instruction thereon. Evidence of defendant's conviction of the felony of burglary was properly admitted on the issue of prior felony convictions. More important, evidence of the facts underlying his conviction of the felony of assault with intent to commit rape was properly admitted on the issue of other violent criminal activity. We presume, as we must, that a reasonable juror would have improperly considered the latter conviction under the instruction here determined erroneous. But we simply cannot conclude that such a juror could have given that conviction any appreciable weight independent of its underlying facts. Accordingly, there is no reasonable possibility that the error affected the outcome.[24]

---

[24]Defendant claims that the instruction on the penalty factor of prior felony convictions was error under the United States Constitution—and perhaps also the California Constitution—as well as California statutory law. But he fails to persuade us that any of the provisions of either the federal or state charter is implicated.

We note in passing that in *People v. Miranda, supra,* 44 Cal.3d at page 106, footnote 28, we stated that "Although we doubt that a jury would believe that" an instruction in the language of section 190.3 covering other violent criminal activity and prior felony convictions "embrace[s] the guilt phase offenses, in order to avoid any possible confusion on this point or the application of the factors, the trial court *in the future* should expressly instruct that" those factors "refer to crimes other than those underlying the guilt determination." (Italics added.) This case was tried after *Miranda.*

### 5. *Alleged Failure to Instruct on the People's Burden of Proof Beyond a Reasonable Doubt as to Other Violent Criminal Activity*

Defendant contends that the trial court erred by—allegedly—failing to instruct the jury sua sponte that the People had the burden to prove beyond a reasonable doubt that he committed the felony of assault with intent to commit rape before they could consider such crime as a circumstance in aggravation.

At the penalty phase of a capital trial, the court must instruct the jury sua sponte that they may consider evidence of other crimes in aggravation only if such other crimes are proved beyond a reasonable doubt. (*People v. Benson, supra,* 52 Cal.3d at p. 809.) For present purposes, other crimes clearly refer to other violent criminal activity—more particularly, other *unadjudicated* violent criminal activity (see *People v. Morales, supra,* 48 Cal.3d at p. 566). The reason for the rule is that undue prejudice is threatened by evidence of violent criminal activity, and sufficient probativeness is assured without a previous conviction only through the requirement of proof beyond a reasonable doubt.

Turning to defendant's claim, we find no error. It appears that a reasonable-doubt instruction is not required when, as here, the defendant has already been convicted of the crime in question. (*People v. Morales, supra,* 48 Cal.3d at p. 566.) In arguing to the contrary, defendant asserts that his conviction had not been entered before commission of the capital and other offenses against Marcie D. True, as stated above, the time of entry controls the question whether defendant's felony conviction is a "prior felony conviction" within the meaning of section 190.3. But such chronology is of no consequence here. All that matters is that the conviction was in fact entered.

Be that as it may, we believe that the trial court adequately instructed that the People had the burden of proof beyond a reasonable doubt as to defendant's commission of assault with intent to commit rape before that crime could be considered as a circumstance in aggravation.

The trial court expressly instructed on the People's burden as to defendant's *conviction* of the felony of assault with intent to commit rape: "Evidence has been introduced for the purpose of showing that the defendant has been convicted of the crime[ ] of . . . assault with intent to commit rape . . . . Before you may consider any . . . such alleged crime[ ] as an aggravating circumstance in this case, you must first be unanimously satisfied beyond a reasonable doubt *that the defendant was in fact convicted of such prior crime*[ ]." (Italics added, paragraphing omitted.)

By contrast, the trial court did not instruct expressly on the People's burden as to the crime supporting the conviction. But—at defendant's request—it did instruct on that matter impliedly: "The burden of proof upon the prosecution to prove the existence of aggravating circumstances beyond a reasonable doubt does not apply to mitigating circumstances. If you find that reasonable evidence supports the existence of a mitigating circumstance, you shall find that such mitigating circumstances exist." (Paragraphing omitted.) It is plain that the People sought to prove that defendant had in fact committed the crime as a circumstance in aggravation. And it is plain— albeit implicit—that their burden in this regard was "beyond a reasonable doubt."[25]

### 6. *Instruction on Extreme Mental or Emotional Disturbance*

The trial court instructed the jury that in determining penalty, they should consider, among other circumstances, "Whether or not the offense was committed while the defendant was under the influence of *extreme* mental or emotional disturbance." (Italics added.) The ultimate source of the foregoing language is, of course, section 190.3.

■■■ Defendant contends that the trial court erred by failing to delete the adjective "extreme" sua sponte. He argues in substance that the instructions as given, without the deletion, amounted to an incorrect statement of the law: (1) under the cruel and unusual punishments clause of the Eighth Amendment, "the sentencer . . . [may] not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death" (*Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 990, 98 S.Ct. 2954], italics in original (plur. opn. by Burger, C. J.); accord, *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 110 [71 L.Ed.2d 1, 8, 102 S.Ct. 869]; *Skipper* v. *South Carolina* (1986) 476 U.S. 1, 4 [90 L.Ed.2d 1, 6-7, 106 S.Ct. 1669]); (2) defendant proffered mental or emotional disturbance, nonextreme as well as extreme, as a basis for life imprisonment without possibility of parole; and (3) contrary to the constitutional principle stated above, the challenged instruction implied that the jurors could not

---

[25] A question arises whether a reasonable-doubt instruction remains necessary when the People seek to prove conduct underlying the conviction other than the facts necessarily established. It appears that the answer would be affirmative. (See *People* v. *Kaurish* (1990) 52 Cal.3d 648, 707 [276 Cal.Rptr. 788, 802 P.2d 278]; *People* v. *Morales, supra,* 48 Cal.3d at p. 566.) Surely, the conviction itself does not assure sufficient probativeness as to such other facts. The issue, however, need not be resolved here. The People did not seek to prove conduct underlying defendant's conviction of the felony of assault with intent to commit rape appreciably beyond the least adjudicated facts. More important, as explained above, the trial court adequately instructed on the People's burden.

consider mental or emotional disturbance less than extreme in mitigation of penalty.

Defendant's claim is without merit. To be sure, the major premise of his argument is sound. But a crucial minor premise is not: the instructions as given, without the deletion of the adjective "extreme," did not carry the preclusive implication defendant asserts they did.

"What is crucial" for the Eighth Amendment's cruel and unusual punishments clause "is the meaning that the instructions *communicated to the jury.* If that meaning was not objectionable, the instructions cannot be deemed erroneous. It now appears that we are to determine the meaning of the instructions *not* under the strict 'reasonable juror' test—i.e., could a reasonable juror have understood the charge as the defendant asserts—but rather under the more tolerant 'reasonable likelihood' test—i.e., is there a reasonable likelihood that the jury so understood the charge." (*People* v. *Benson, supra,* 52 Cal.3d at p. 801, italics in original, citations omitted.)

Here, the jury was broadly instructed on the scope of potentially mitigating evidence, including evidence relating to background and character. Specifically, they were told that they could consider "Any . . . circumstance which diminishes the gravity of the crime even though it is not a legal excuse of the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial."

The jury was also told that they could take into account, "as a mitigating circumstance," both "evidence that the defendant may have a biological brain impairment" and "evidence that a child raised in a family where physical abuse and emotional deprivation occurred, may, as a result, suffer emotional harm."

The jury was further told that "The mitigating circumstances which I have read for your consideration are given to you as examples of some of the factors that you may take into account as reasons for deciding not to impose a death sentence upon the defendant. You should pay careful attention to each of those factors. Any one of them may be sufficient, standing alone, to support a decision that death is not the appropriate punishment in this case. But you should not limit your consideration of mitigating circumstances to these specific factors." (Paragraphing omitted.)

In our view, there is no reasonable likelihood that the jury would have been led by the instructions to entertain the erroneous belief that they could not consider mental or emotional disturbance *of any degree whatever* in

mitigation of penalty. Quite the contrary. Under the instruction of which defendant now complains, they would have understood that they could take account of disturbance that was extreme. Under the instructions quoted in the three paragraphs immediately preceding, they would have inferred that they could weigh disturbance that was less than extreme. (Compare *People* v. *Benson, supra,* 52 Cal.3d at p. 804 [rejecting a claim similar to defendant's involving the trial court's refusal to delete the adjective "extreme" from the phrase "extreme mental or emotional disturbance"].)

### 7. *Alleged Failure to Adequately Instruct on the Scope of Potentially Mitigating Evidence*

Defendant contends that the trial court erred by—allegedly—failing to adequately instruct the jury on the scope of potentially mitigating evidence as defined by the cruel and unusual punishments clause of the Eighth Amendment, as construed in *Lockett* v. *Ohio, supra,* 438 U.S. 586, and its progeny, which includes "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death" (*id.* at p. 604 [57 L.Ed.2d at p. 990] (plur. opn. by Burger, C. J.).

We reject the point out of hand. Again, what is crucial for the Eighth Amendment's cruel and unusual punishments clause is the meaning that the instructions *communicated to the jury.* In light of the instructions quoted in the preceding part, there is no reasonable likelihood that the jurors would have been led to entertain an erroneously narrow belief about the scope of potentially mitigating evidence.

Defendant claims that the trial court did in fact err. He argues that the jury was not adequately instructed to consider his "background," as opposed to his "character" and "record." We think that "background" is embraced by "character" and, especially, "record." There is no reasonable likelihood that the jurors would have believed otherwise. In view of the fact that the jurors were broadly instructed on the scope of potentially mitigating evidence, including evidence relating to background, defendant's argument proves to be altogether unpersuasive.

### 8. *Refusal to Give a Requested Instruction on Future Nondangerousness*

Defendant requested the trial court to give "Defendant's Proposed Instruction No. 22": "You may consider as a mitigating circumstance evidence that [defendant] would serve the rest of his life in state prison as a cooperative and compliant prisoner." The court refused.

Defendant contends that by doing so the trial court erred. We disagree. "A court may—and, indeed, must—refuse an instruction that is argumentative, i.e., of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence." (*People v. Gordon, supra*, 50 Cal.3d at p. 1276.) The same is true of an instruction that is incorrect. (See *id.* at p. 1275.) The requested instruction was plainly argumentative. And to the extent it implied that the sentence of life imprisonment without possibility of parole would inexorably be carried out, it was also incorrect.

Defendant claims that the trial court did indeed err. He argues that he was entitled to the requested instruction under *People v. Sears* (1970) 2 Cal.3d 180, 189-190 [84 Cal.Rptr. 711, 465 P.2d 847]. He is wrong. Under that case, a criminal defendant has a right to an instruction that pinpoints the *theory* of the defense. (*People v. Benson, supra*, 52 Cal.3d at p. 806; *People v. Gordon, supra*, 50 Cal.3d at p. 1276.) The instruction here did not do so. He also argues that he was entitled to the requested instruction under the cruel and unusual punishments clause of the Eighth Amendment, as construed in *Lockett v. Ohio, supra*, 438 U.S. 586, and its progeny. Again he is wrong. Under those cases, a criminal defendant has a right to clear instructions that guide and focus the jury's consideration of the offense and the offender. (*People v. Benson, supra*, at p. 806; *People v. Gordon, supra*, at p. 1277.) Defendant received such instructions. But under those cases, a criminal defendant does not have a right to an instruction—like the one here—that invites the jury to draw favorable inferences from the evidence. (*People v. Benson, supra*, at p. 806; *People v. Gordon, supra*, at p. 1277.)

> 9. *Refusal to Give a Requested Instruction on Aggravating and Mitigating Circumstances*

Defendant requested the trial court to give "Defendant's Proposed Instruction No. 10": "If a factor is not found to be by you a mitigating factor, that in and of itself does not make that factor an aggravating factor." The court refused, stating that the proposed instruction was "covered" in other instructions.

 Defendant contends that the trial court's refusal was error under California law. He argues that the court should have told the jurors that the absence of a circumstance in mitigation did not constitute the presence of a circumstance in aggravation. But through the charge as a whole, the court adequately—albeit only impliedly—made that very point. Surely, the words actually used by the court were far clearer than those proposed by defendant. A court may refuse an instruction that is confusing (*People v. Gordon, supra*,

50 Cal.3d at p. 1275) or duplicative (*People v. Benson, supra,* 52 Cal.3d at p. 805, fn. 12). The requested instruction was both. There was no error.[26]

E. *Failure to Give a* <u>Collins</u> *Instruction*

 Defendant contends that the trial court erred by failing to instruct the jury sua sponte in accordance with *People v. Collins* (1976) 17 Cal.3d 687 [131 Cal.Rptr. 782, 552 P.2d 742]. Recall that in the midst of the penalty phase, before deliberations had commenced, the court had discharged a juror at the juror's request and replaced him with an alternate.

In *Collins,* we "construe[d] [Penal Code] section 1089 to provide that the court instruct the jury to set aside and disregard all past deliberations and begin deliberating anew." (17 Cal.3d at p. 694.) We declared that in support of such an instruction, the court "should . . . further advise[ ]" the jury "that one of its members has been discharged and replaced with an alternate juror as provided by law; that the law grants to the People and to the defendant the right to a verdict reached only after full participation of the 12 jurors who ultimately return a verdict; that this right may only be assured if the jury begins deliberations again from the beginning; and that each remaining original juror must set aside and disregard the earlier deliberations as if they had not been had." (*Ibid.*)

The trial court's failure to give a *Collins* instruction sua sponte was not error. California law does not demand such an instruction under the circumstances here. "*Collins* requires the trial court to instruct the jurors to begin deliberation anew if substitution becomes necessary after the jury has begun its deliberations. [Citation.] Here, the alternate juror joined the panel of jurors . . . before the penalty phase deliberations began." (*People v. Brown, supra,* 46 Cal.3d at p. 461; accord, *People v. Wright, supra,* 52 Cal.3d at p. 420.) Neither does the United States Constitution demand such an instruction in the present situation. Certainly—contrary to defendant's assertion—the Sixth, Eighth, and Fourteenth Amendments have nothing significant to say about a *Collins*-like instruction in a case of this sort.

---

[26]Defendant claims that the trial court's refusal of the instruction he requested was error under the United States Constitution as well as California law. He argues that instructional error under state law is ipso facto offensive to the due process clause of the Fourteenth Amendment. But yet again we note that a state-law violation is *not* automatically a violation of federal constitutional due process. In any event, there was no instructional error here under state law.

Defendant may be understood to claim that because the prosecutor—assertedly—presented improper argument on remorse, the trial court erred under both the United States Constitution and California law by failing to expressly instruct the jury sua sponte that the absence of mitigation did not amount to the presence of aggravation. But as explained, the argument was not improper.

### F. *Effect of Guilt Phase Errors*

Defendant contends that such errors as were committed at the guilt phase require reversal of the judgment of death. We disagree. As defendant impliedly—and rightly—concedes, these errors are not automatically reversible either singly or together, but are subject to harmless-error analysis. Further, even under *Chapman*'s "reasonable doubt" standard, for whose applicability defendant strongly argues, the errors must each and all be deemed harmless: as the pertinent discussion demonstrates, they were few in number and minimal in significance.

### G. *"Cumulative" Prejudice*

Defendant contends that when considered together, such errors as were committed at trial, especially those bearing directly on penalty, require reversal of the judgment of death. His argument, in substance, is that the errors undermined the fairness of the penalty-determining process and vitiated the reliability of its result. Having reviewed the record in its entirety, we cannot agree. The errors at trial as a whole—like those at the guilt phase only—were few in number and minimal in significance. Neither singly nor together could they have affected the process or the result to defendant's detriment.

### H. *Denial of Verdict-modification Application*

Defendant made an application for modification of the verdict of death under Penal Code section 190.4, subdivision (e) (hereafter section 190.4(e)). The trial court denied the request. ▉▉▉ Defendant contends that the court erred by so doing.

▉▉▉ "In ruling on a verdict-modification application, the trial judge is required by section 190.4(e) to 'make an independent determination whether imposition of the death penalty upon the defendant is proper in light of the relevant evidence and the applicable law.' That is to say, he must determine whether the jury's decision that death is appropriate under all the circumstances is adequately supported. And he must make that determination independently, i.e., in accordance with the weight he himself believes the evidence deserves." (*People* v. *Marshall, supra,* 50 Cal.3d at p. 942, citations omitted.) Obviously, the evidence that he considers is that which was properly presented to the jury (e.g., *People* v. *Williams* (1988) 45 Cal.3d 1268, 1329 [248 Cal.Rptr. 834, 756 P.2d 221])—no more, no less (*People* v. *Jennings, supra,* 46 Cal.3d at p. 995).

On appeal, we subject a ruling on a verdict-modification application to independent review: the decision resolves a mixed question of law and fact;

a determination of this kind is generally examined de novo (see generally *People* v. *Louis, supra,* 42 Cal.3d at p. 987, following *United States* v. *McConney, supra,* 728 F.2d at p. 1202 (in bank)). Of course, when we conduct such scrutiny, we simply review the trial court's determination after independently considering the record. We do not ourselves decide the verdict-modification application.

 Prior to taking up defendant's verdict-modification application on the date set for hearing, the trial court allowed Donna D., Marcie D.'s mother, to make a statement. Mrs. D. spoke of such matters as Marcie's personal characteristics, the emotional impact of the crimes on the family, and her own opinion about defendant and his offenses; in conclusion, she requested imposition of the ultimate sanction. Defendant made no objection to the foregoing statement. Also, the court indicated that it had reviewed a presentence report. Defendant moved to strike the report in its entirety as unduly prejudicial and unreliable. The court denied the request. It did, however, expressly invite defendant to challenge portions of the report, and stated its inclination to sustain such an attack. Defendant expressly declined.

Thereupon, the trial court proceeded to hear defendant's verdict-modification application. After argument, it denied the request and stated its reasons in support. It determined, in short, that "the totality of the aggravating evidence outweighed the mitigating evidence offered by the defense." As it explained after sentencing, "All I can tell you, Mr. Ashmus, is if there was ever a case where factually [the death penalty] was deserved, this is it."

Defendant claims that in ruling on his verdict-modification application, the trial court erred by allegedly considering evidence that it ought not have—viz., Mrs. D.'s statement and the presentence report. He argues that the report was outside the compass of review under section 190.4(e) because it had not been presented to the jury. He further argues that the statement was similarly outside the compass of review and also inadmissible in and of itself under the Eighth Amendment principles of *Booth* v. *Maryland, supra,* 482 U.S. 496, and *South Carolina* v. *Gathers, supra,* 490 U.S. 805, and the Fourteenth Amendment guaranty of due process of law.

There was no error. To the extent it rests on the Eighth and Fourteenth Amendments, the point fails. "[T]he broad holding of *Booth* and *Gathers* does not extend to proceedings relating to the application for modification of a verdict of death under section 190.4(e)." (*People* v. *Benson, supra,* 52 Cal.3d at p. 812.) Moreover, as noted above, in large part *Booth* and *Gathers* are no more. Further, no due process violation appears. And to the extent it

rests on section 190.4(e), the result is no different. "From [its] statement [of reasons] it is manifest that the court made its decision solely in light of the applicable law and the relevant evidence" (*People* v. *Benson, supra,* at p. 812)—and did not take anything else into account. Certainly, the reasons the court gave do not reflect Mrs. D.'s statement or the presentence report. It is clear that the court allowed the statement not as evidence or argument relating to the application, but merely as a kind of allocution before sentencing. It is also clear that the court did not review the report for purposes of its determination. True, immediately prior to sentencing, the court stated that it "ha[d] read and considered the presentence report . . . ." But as the context of its words reveals, it had evidently done so "solely for the permitted purpose of sentencing on the noncapital offenses . . . ." (*People* v. *Lang* (1989) 49 Cal.3d 991, 1044 [264 Cal.Rptr. 386, 782 P.2d 627].)[27]

Next, defendant claims that in ruling on his verdict-modification application, the trial court erred by allegedly refusing to consider—or at least, refusing to give effect to—certain potentially mitigating evidence.

As stated above, *Lockett* v. *Ohio, supra,* 438 U.S. 586, and its progeny teach that under the cruel and unusual punishments clause of the Eighth Amendment, the scope of potentially mitigating evidence includes "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (*Id.* at p. 604 [57 L.Ed.2d at p. 990] (plur. opn. by Burger, C. J.).) Such evidence may carry potentially mitigating weight whether or not it has any tendency to extenuate the defendant's guilt. (E.g., *People* v. *Marshall, supra,* 50 Cal.3d at p. 933, fn. 5.)

In support of his point, defendant argues that the trial court refused to consider or give effect to the evidence he presented in mitigation bearing on his background and character solely because it deemed that evidence "nonextenuating."

We believe that the trial court understood that potentially mitigating evidence embraces "nonextenuating" as well as "extenuating" background

---

[27]Defendant claims that the "introduction" of Mrs. D.'s statement and the presentence report on the matter of the verdict-modification application was erroneous under California law—and ipso facto offensive to the due process clause of the Fourteenth Amendment. But as noted, a state-law violation is *not* automatically a violation of federal constitutional due process. In any event, there was no state-law violation: the trial court did not receive either the statement or the report on the question here.

In a related and overlapping point, defendant claims that the trial court erred under the United States Constitution and also under California law when it allegedly considered the presentence report in ruling on his verdict-modification application. But as explained above, the court did not take the report into account in making its decision.

and character evidence. Recall that it had instructed the jury that they could "consider sympathy, pity, or mercy"; that they could take into account "Any . . . circumstance which diminishes the gravity of the crime even though it is not a legal excuse of the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial"; and that they could weigh, "as a mitigating circumstance," both "evidence that the defendant may have a biological brain impairment" and "evidence that a child raised in a family where physical abuse and emotional deprivation occurred, may, as a result, suffer emotional harm"—evidence that was plainly "nonextenuating." There is no reason to think that the court had not itself learned the lesson it had taught the jurors.

We also believe that the trial court actually considered, and gave some weight to, all of defendant's mitigating background and character evidence, "nonextenuating" as well as "extenuating." At one point, it declared: "Overall, the court evaluates the mitigating evidence as presenting a picture of a defendant with a tortured and unstable and rebellious personality and early life, adverse to discipline, unfortunately being raised by two parents who were less than capable of recognizing the defendant's developmental problems." At another: "This court agrees that Mr. Ashmus has truly lived a torturous life for a man his age."

We recognize that the trial court concluded in effect that the evidence that defendant presented in mitigation relating to his background and character did not extenuate his guilt. But that conclusion does not imply a belief that only "extenuating" evidence could be mitigating. Neither does it suggest a decision to deny effect to "nonextenuating" evidence. It merely reveals a determination—which, in our view, is sound—that the evidence at issue was not in fact extenuating.

I. *Constitutionality of the 1978 Death Penalty Law*

 Defendant contends that the 1978 death penalty law is facially invalid under the United States and California Constitutions, and hence that the judgment of death entered pursuant thereto is unsupported as a matter of law. Having time and again considered claims such as defendant's in a series of decisions beginning with *People v. Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113], we may summarize the views expressed therein thus: as a general matter at least, the 1978 death penalty law is facially valid under the federal and state charters. In his argument here, defendant raises certain specific constitutional challenges. But he

recognizes that in the *Rodriguez* series of cases, we have rejected each and every one. We see no need to rehearse or revisit our holdings or their underlying reasoning. ■■■■■ The point fails.[28]

### J. *Sentencing on the Noncapital Offenses*

The trial court sentenced defendant to full, separate, and consecutive middle terms of six years in prison for his convictions of the noncapital offenses of rape, sodomy, and lewd conduct (to run consecutively to a previously imposed sentence for his conviction of the felony of assault with intent to commit rape against Lisa Cronin). The People had effectively requested (1) that the court impose sentence for the noncapital offenses under the harsher provisions of Penal Code section 667.6, subdivision (c) (hereafter section 667.6(c)), instead of the less harsh provisions of Penal Code section 1170.1 (hereafter section 1170.1), and (2) that pursuant to section 667.6(c), the court impose full, separate, and consecutive upper terms of eight years in prison.

Defendant contends that the sentence imposed for the noncapital offenses is invalid. In support, he puts forth several arguments.

■■■■ Defendant claims that the trial court erred in sentencing on all the noncapital offenses generally.

In determining punishment for convictions such as the present, a court must make the following sentencing choices: whether to sentence concurrently or consecutively; and if consecutively, whether to sentence under section 1170.1 or section 667.6(c). (*People* v. *Belmontes* (1983) 34 Cal.3d 335, 342-349 [193 Cal.Rptr. 882, 667 P.2d 686]; see *People* v. *Coleman* (1989) 48 Cal.3d 112, 161-162 [255 Cal.Rptr. 813, 768 P.2d 32].) For each choice, it must state its reasons on the record. (*People* v. *Belmontes, supra,* at pp. 347-349; see *People* v. *Coleman, supra,* at pp. 161-162.)

The trial court here evidently chose to impose consecutive sentences for the noncapital offenses *and* to do so under section 667.6(c).

---

[28]Having reviewed the record in its entirety, we conclude that the jury found that defendant actually killed, *and* intended to kill, Marcie D. within the meaning of *Enmund* v. *Florida* (1982) 458 U.S. 782, 788-801 [73 L.Ed.2d 1140, 1145-1154, 102 S.Ct. 3368]. We also conclude that these findings are amply supported and adopt them as our own. Accordingly, we hold that imposition of the penalty of death on defendant does not violate the Eighth Amendment to the United States Constitution. (See *Cabana* v. *Bullock* (1986) 474 U.S. 376, 386 [88 L.Ed.2d 704, 716-717, 106 S.Ct. 689].)

Defendant argues—unpersuasively—that the trial court failed to state its reasons. It effectively did so in its ruling on defendant's verdict-modification application. Its failure to make a separate statement under a separate label is manifestly not fatal.

Defendant then claims that the trial court imposed a full, separate, and consecutive sentence for the offense of sodomy under section 667.6(c), as it then stood, contrary to the requirements of a line of cases culminating in *People* v. *Ramirez* (1987) 189 Cal.App.3d 603 [233 Cal.Rptr. 645]. The *Ramirez* court held that such a sentence is authorized only when, as relevant here, a defendant has been found guilty of the offense beyond a reasonable doubt "by . . . threat of great bodily harm." (*Id.* at pp. 630-632.) In view of the theories advanced at trial and the evidence presented, the jury must be deemed to have made just such a finding when it rendered its verdict here.

Defendant also claims that the trial court imposed sentence for the offense of lewd conduct in violation of Penal Code section 654. He relies on *People* v. *Siko* (1988) 45 Cal.3d 820 [248 Cal.Rptr. 110, 755 P.2d 294], but to no avail. In that case, we held that the defendant, who had been convicted of rape, sodomy, and lewd conduct, could not be punished for all three offenses. There, we were able to conclude that the lewd conduct consisted solely of the rape and the sodomy: "the charging instrument and the verdict both identify the lewd conduct as consisting of the rape and the sodomy rather than any other act." (*Id.* at p. 826.) ▮▮ ▬ ▬ Here, we are unable to come to a similar conclusion.[29]

## VI. Disposition

For the reasons stated above, we conclude that the judgment must be affirmed.

---

[29]In a supplemental brief filed before oral argument, defendant contends that to the extent that any claim herein is not preserved for review as a result of any of trial counsel's acts or omissions, counsel provided ineffective assistance in violation of the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. Defendant asserts the point perfunctorily. We deny it in the same fashion. "Defendant has the burden of establishing," on the basis of "the record on appeal" and by means of "facts, not speculation," that "counsel rendered ineffective assistance." (*People* v. *Mattson* (1990) 50 Cal.3d 826, 876-877 [268 Cal.Rptr. 802, 789 P.2d 983].) He has not done so.

It is so ordered.

Lucas, C. J., Panelli, J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.

Appellant's petition for a rehearing was denied January 29, 1992.